MATILDE CARDONA, recurrente, *v.* LA COMISIÓN INDUSTRIAL DE PUERTO RICO, compuesta por los SRES. M. LEÓN PARRA, Presidente, y F. PAZ GRANELA y JUAN M. HERRERO, Comisionados Asociados, demandada; y RAMÓN MONTANER, ADMINISTRADOR DEL FONDO DEL SEGURO DEL ESTADO, recurridos.

Núm. 195.—*Sometido:* Abril 8, 1940. *Resuelto:* Mayo 24, 1940.

848

*Negrón López & Negrón López*, abogados del recurrente; *M. León Parra*, abogado de la Comisión; *Hon. Procurador General George A. Malcolm, E. de Aldrey, Procurador General Auxiliar*, y *Víctor J. Vidal González* y *Guillermo Atiles Moréu*, Asesores Legales los dos últimos del Fondo del Seguro del Estado, abogados del Administrador recurrido.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Matilde Cardona interpuso el presente recurso de revisión alegando substancialmente que el obrero Luis Rodríguez Cardona falleció a consecuencia de un accidente del

trabajo ocurrido en abril 30, 1939, habiendo resuelto el Administrador del Fondo del Seguro del Estado que el accidente no era uno de los protegidos por la ley sobre la materia, núm. 45 de 1935 ((1) pág. 251).

Que la recurrente apeló para ante la Comisión Industrial y la Comisión después de celebrada una vista en la que ambas partes practicaron prueba testifical confirmó la resolución del Administrador. Pidió reconsideración y le fué negada en febrero 21, 1940.

Que no está conforme porque los hechos del caso son que el obrero Rodríguez trabajaba como ayudante en un *truck* propiedad del patrono Cities Delivery Express guiado por el chófer Tomás Mas; que el *truck* esperaba su turno para cargar en la Central Mercedita y cuando llegó el chófer llamó a su ayudante con el nombre de "socio" y como no se presentara dió manigueta y prendió el *truck,* revolucionando la máquina hacia atrás atrapando a Rodríguez, ocasionándole la muerte.

Que las defensas del Administrador fueron, que el obrero ocupó una posición peligrosa al acostarse debajo del *truck* y que el obrero fué culpable de negligencia temeraria al contravenir instrucciones de su patrono de no acostarse debajo de los *trucks.*

Que la evidencia practicada estableció el hecho del accidente que ambas partes aceptaron, sin que ningún testigo declarara que el obrero estuviera acostado debajo del *truck,* sin que ningún testigo lo viera antes del accidente ni supiera lo que hacía detrás del *truck,* habiéndose demostrado que el patrono nunca hizo advertencias a sus obreros.

Termina imputando a la Comisión específicamente los siguientes errores:

"1.—Al no resolver que una vez probado el accidente, correspondía al Administrador del Fondo del Seguro del Estado probar afirmativamente los hechos que constituían su defensa.

"2.—Al aplicar erróneamente las teorías de evidencia circunstancial a la prueba de este caso.

"3.—Al declarar probados dos hechos que no intentó probar el Administrador del Fondo del Seguro del Estado, y sobre los cuales no hubo prueba alguna, a saber: (a) que el obrero se quedó dormido debajo del truck, y (b) que el obrero abandonó deliberadamente su trabajo para ir a dormir.

"4.—Al no resolver que para existir la imprudencia temeraria era necesario que al obrero se le advirtiera el peligro que corría.

"5.—Al resolver que este caso no es compensable de acuerdo con la Ley Núm. 45 de 18 de abril de 1935."

Expedido el auto se señaló la vista para abril 8, 1940. En marzo 25 radicó su alegato la recurrente y en abril 8 los recurridos. Sus abogados informaron oralmente el ocho y el 22 de abril replicó por escrito la recurrente.

Los hechos que declaró probados la Comisión y a virtud de los cuales confirmó la resolución del Administrador, fueron:

"La evidencia demuestra que Luis Rodríguez Cardona era un auxiliar o ayudante del truck que guiaba Tomás Mas Rivera allá para abril del año 1939 ... Demuestra claramente que ... Mas, ... ordenó a su ayudante ... que no se fuera lejos del truck porque dentro de poco iban a cargar, y era el ayudante ... quien tenía el deber de darle manigueta al truck mientras el chófer lo aceleraba para empezar a correr.

". . . que Luis Rodríguez Cardona no estaba listo para trabajar en el momento en que se necesitó, porque cuando el chófer del truck lo llamó para que le diera manigueta para echar a correr el truck y empezar a cargar, . . . no respondió. Tomás Mas Rivera llamó repetidas veces y en alta voz . . . sin que éste contestara ... Pensó . . . que su ayudante estuviera en otro sitio chupando cañas ... procedió a darle manigueta al carro, y como no podía atender a la vez al acelerador le puso a éste su pedazo de tabla que hiciera peso sobre el acelerador a fin de que cuando él le diera manigueta al truck la máquina pudiera funcionar, lo que logró ... Es cuando ... le da reversa al truck que se oyeron los quejidos de una persona y fué entonces que Luis Rodríguez Cardona sale de debajo del truck y de detrás de las ruedas traseras del mismo, quejándose y haciendo contorsiones por haberle pasado las ruedas traseras del truck por encima del pecho. Ninguno de los testigos declaró haber visto a Luis Rodríguez durmiendo debajo del truck, pero ninguno de los testigos pudo declarar

en cuanto a dónde se encontraba... antes del accidente. Los testigos vinieron a darse cuenta de que... estaba debajo del truck cuando salió de debajo de éste quejándose y haciendo contorsiones.

". . . que Luis Rodríguez Cardona después que hizo los preparativos que tuvo que hacer en el truck antes de que llegara el turno para . . . cargar, se fué y se acostó debajo del truck quedándose allí dormido. Las circunstancias y los hechos así lo demuestran, porque el chófer del truck llamó insistentemente y en alta voz a su ayudante . . . y éste no respondió. Esto demuestra que . . . se quedó dormido debajo del truck y no pudo oír las llamadas que le hacía Tomás Mas Rivera. La evidencia no asegura que el patrono hubiese dado instrucciones a los empleados de trucks de que no durmieran debajo de éstos, pero es razonable pensar que debajo de un truck no es un sitio seguro ni confortable para ningún ser humano dormir, y menos aun cuando ese truck está listo, o haciendo turno para cargar o descargar.

". . . La muerte de Luis Rodríguez Cardona no fué ocasionada porque él se hubiera caído del truck, ni porque sufriera lesiones mientras hubiera estado dándole manigueta al truck, ni porque hubiera sido lesionado mientras hubiera tratado de subir al truck, ni porque hubiera sido lesionado por las ruedas traseras del truck al dar éste reversa y en cuyo momento hubiese estado detrás del truck dándole alguna señal o aviso al chófer mientras éste le estuviera dando reversa al truck. En ninguna de estas circunstancias le ocurrió el accidente . . . le ocurrió . . . por haberse quedado dormido debajo del truck. Su deber no era acostarse a dormir debajo del truck, ni descansar debajo del truck. Un testigo demostró que había otro sitio más adecuado para una persona descansar y protegerse del sol y de la lluvia mientras el truck estuviera parado.''

Y la evidencia practicada ante la Comisión fué así:

Efigenio Rivera, declaró que era chófer de un *truck* de la Cities Delivery Express y Tomás Mas de otro; que el obrero Rodríguez Cardona trabajaba de ayudante con Tomás Mas; que el 30 de abril llegó a la Central Mercedita y paró el carro "al compás del carro de" Mas, que ya estaba allí; que en el asiento del carro de Mas estaba acostado el ayudante y Mas "le dijo que preparara el carro que ya pronto iban a cargar; el muchacho se levantó a preparar el *truck,* la compuerta y demás, tendió la lona y mientras tanto Tomás

se recostó en el asiento del *truck* . . . llaman a Tomás para que venga a cargar y Tomás se baja y empieza a llamar al socio'' Rodríguez Cardona; ''al no contestar, como ellos tienen la costumbre de irse para los molinos a chupar caña, . . . Tomás fué a prender el *truck* . . . no lo esperó, . . . le dió manigueta y en lo que llegó al acelerador, se apagó 'a máquina y entonces cogió un pedazo de palo y se lo puso . . . le dió un poquito para atrás y dice él que sintió cuando el carro brincó, yo no vi al hombre acostado en ningún momento, pero entonces ese otro testigo dice que cuando corrió, cuando salió le dijo que parara, que lo pisó y fuimos allí y encontramos que el hombre se estaba revolcando.''

A las siguientes preguntas del Comisionado contestó:

.''P.—¿Usted vió a Luis Rodríguez durmiendo debajo del truck? —R.—No, señor.—P.—Si usted ha dicho que durmió, ¿fué porque lo vió o le dijeron?—R.—Porque se presumía, se dijo que estaba durmiendo en el asiento del truck.''

José Pietri, chófer de un truck de la Sucesión Méndez, que también se encontraba allí, declaró que avisado Tomás Mas de que había llegado su turno ''se fué para el *truck* . . . y llamó a un muchacho, los *trucks* estaban frente a frente y entonces él fué a darle manigueta y cuando le dió manigueta se le apagó . . . entonces consiguió un pedazo de palo y le bajó el acelerador y le dió manigueta otra vez, el *truck* se quedó revolucionando en lo que él daba la vuelta y se montó, pero había otro *truck* contiguo al de él que le impedía salir para alante, entonces echó hacia atrás y yo vi que así al lado del *truck* aquel muchacho hacía así, se movía todo . . . yo creía en mi imaginación que se estaba haciendo, nosotros mismos los chóferes los gritamos para que se espanten los peones y yo creía que estaba bromeando con el mismo chófer, pero entonces vi que cayó para atrás y entonces yo corrí y le dije a Tomás: 'mira, le pasaste por encima a ese muchacho', y entonces él brincó y cuando fuimos donde el muchacho, le habían pasado las dos ruedas por el pecho.''

A las siguientes preguntas del abogado del obrero contestó:

"P.—Si un chófer se tarda en ir a coger su turno, ¿qué le pasa?— R.—Mandan a poner otro.—P.—¿Hay que hacerlo con rapidez?— R.—Sí, señor.—P.—Y Tomás, ¿no tenía interés en llegar pronto?— R.—Si iba a entrar al turno tenía que hacerlo rápido, si tarda cinco minutos mandan a meter otro truck, porque la máquina de botar azúcar no puede esperar.—P.—¿Usted no sabe si él estaba durmiendo?— R.—No, señor, yo lo ví cuando hacía los movimientos.—P.—¿Usted no sabe si se iba a montar y se cayó?—R.—No, señor, nada de eso.— P.—¿No sabe si iba pasando, resbaló y se cayó?—R.—Nada."

Por último declaró el chófer Tomás Mas que "a la una y media de la tarde de ese día", domingo, ya habían dado dos viajes, y su ayudante que se fué a almorzar, llegó y se acostó en el asiento de alante a dormir, "ya hacía como diez minutos que había llegado el muchacho y yo le dije que no se fuera lejos porque íbamos a cargar, ya que íbamos a entrar lo llamé y no lo encontré, yo lo llamaba socio, porque no sabía el nombre de él, lo llamé y lo llamé y no vino, como ellos se iban a chupar caña a los molinos y nosotros entonces poníamos los carros para cargar." A la pregunta del Comisionado "¿Usted lo llegó a buscar debajo del *truck?*" contestó, "Yo lo llamé." Continuó declarando: "No me respondió y busqué para los molinos y no lo vi . . . entonces le di manigueta al carro y se me apagó, entonces yo tengo un pedazo de madera así y se lo puse al acelerador . . . al darle manigueta el motor se revolucionó mucho, al lado estaba el carro de Román y yo le di para atrás al carro y al darle para atrás yo sentí como un grito, me apeé y fuí para abajo y fuí detrás del carro y vi al muchacho meneándose, me pareció que le había pasado algo y entonces le pregunté qué le pasaba y me dijo que las ruedas le pasaron por el estómago, y entonces lo mandamos en una guagua al pueblo."

A las siguientes preguntas del Comisionado contestó:

"P.—¿Usted sabe lo que él hacía detrás de la rueda del carro?— R.—Yo no sé.—¿Usted lo vió dormido?—R.—No, señor.—P.—¿No le

dijo lo que él hacía debajo del truck?—R.—No, señor— . . .—P.—
¿El salió debajo del truck?—R.—Sí, señor, cuando yo lo ví, ya es-
taba fuera del truck.— . . .—P.—¿Pueden los chóferes o los auxilia-
res de esos trucks dormir debajo de esos trucks?—R.—Yo creo que no.
—P.—¿Porque está prohibido por la corporación?—R.—No, señor.—
P.—¿Ellos le han dado algunas instrucciones de que no duerman de-
bajo de los trucks?—R.—Nunca nos la han dado.—P.—¿Y después de
esta desgracia?—R.—Después sí.''

A preguntas del abogado del Fondo del Estado contestó:

''P.—Cuando usted levantó del asiento al obrero, a su ayudante,
y le dijo que ya iban a ponerse a preparar el carro, ¿usted vió para
dónde cogió él?—R.—No lo vi, se me desapareció él, él estaba recos-
tado del asiento y yo lo llamé, él hacía rato que había llegado y había
preparado el carro.—P.—Cuando usted iba a mover el carro, ¿usted
lo llamó?—R.—Sí, señor.— . . .—P.—¿Y él no apareció?—R.—No
apareció.''

Y a preguntas del abogado del obrero contestó:

''P.—¿Por qué usted no esperó que llegara Luis para que le diera
manigueta al carro?—R.—No podemos esperar, porque cuando piden
un carro del almacén, hay que llegar seguido.''

De acuerdo con los términos expresos de la ley que lo
autoriza—Núm. 45 de 1935, pág. 251—el recurso de revisión
contra las órdenes o decisiones finales de la Comisión Indus-
trial sólo ''podrá concederse sobre cuestiones de derecho.''
*Amenguar* v. *Comisión Industrial*, 49 D.P.R. 10; *Aguila* v.
*Juliá*, 50 D.P.R. 625.

Como hemos podido ver al exponer el caso, para resol-
verlo tendremos que revisar la apreciación de la prueba por
parte de la Comisión a los efectos de concluir si el accidente
puede o no calificarse como del trabajo y si o no el obrero
estaba acostado y dormido debajo del *truck* de su patrono.
Tratándose en tal virtud de cuestiones de hecho, sólo podre-
mos intervenir con el fallo de la Comisión si encontráramos
que no hubo prueba para sostenerlo o si al aplicar la ley para
declarar probado el hecho o al hecho tal como se declaró pro-

bado se hubiera cometido algún error substancial. *Montaner, Admor.* v. *Comisión Industrial,* 54 D.P.R. 781, 785; *Umpierre* v. *Comisión Industrial,* 52 D.P.R. 765.

■ ¿Probó la peticionaria un caso prima facie de accidente del trabajo? Veámoslo.

Como se dijo en *Montaner, Amor.* v. *Comisión Industrial,* 53 D.P.R. 197, 199, "De acuerdo con el lenguaje claro del estatuto, tres son los requisitos que deben concurrir para que un accidente sea compensable. La lesión debe (*a*) ser el resultado de un acto o función inherente al empleo, (*b*) haber ocurrido en el curso del empleo, y (*c*) ser consecuencia del empleo. Si faltare uno de esos requisitos, el accidente no sería compensable."

■■ La ocurrencia del accidente que produjo la muerte del obrero en el día y sitio indicados por la recurrente, está admitida. Que el obrero trabajaba como ayudante del chófer del *truck* del patrono, también, y que su muerte ocurrió en horas laborables, en el momento en que el chófer llamaba al obrero para mover el *truck* y el *truck* se movía para tomar su carga, surge claro de la prueba.

A nuestro juicio ello es bastante para colocar el caso, prima facie, dentro de la Ley de Compensaciones por Accidentes del Trabajo de 1935.

Schneider en su obra "Workmen's Compensation Law," vol. II, pág. 1855, tópico 527, de la segunda edición, dice:

"Una persona encontrada muerta en un lugar donde se suponía que estuviera actuando en el curso de su empleo, se presumirá que ha sido muerta en el curso de su empleo."

Para fundamentar el texto cita: *Donlon* v. *Kips Bay Brewing & Malting Co.,* App. Div., 179 N.Y.S. 93, 5 W.C.L.J. 429, (1919); *Flucker* v. *Carnegie Steel Co.,* Pa. (1919), 106 Atl. 192, 3 W.C.L.J. 780, 18 N.C.C.A. 1056; *Saunders* v. *New England Collapsible Tube Co.,* Conn. (1920), 110 Atl. 538, 6 W.C.L.J. 271; *Sparks Milling Co.* v. *Indus. Comm.,* Ill. (1920), 127 N.E. 737, 6 W.C.L.J. 299.

■ Se sostuvo por el Administrador del Fondo que el caso no era compensable porque el obrero ocupó una posición peligrosa al acostarse debajo del *truck* y que el obrero contravino las instrucciones contrarias sobre ello dádasle por su patrono. Con respecto a las instrucciones, la defensa quedó descartada por la propia Comisión. No se presentó evidencia para sostenerla. En relación con la posición peligrosa, la Comisión no sólo declaró probado que el obrero se acostó debajo del *truck* si que se quedó allí dormido. ¿Le proporcionó la evidencia practicada alguna base legal para hacerlo? De cómo se conteste esta pregunta depende la decisión del recurso.

Al artículo 4, núm. 4, de la Ley Núm. 45 de 1935, pág. 273, prescribe:

"Artículo 4.—No son accidentes compensables del trabajo y no darán por consiguiente, derecho a compensación al obrero, empleado o a sus beneficiarios de acuerdo con esta Ley, los que ocurren en las siguientes circunstancias:

" * * * * * * *

"4. Cuando la imprudencia temeraria del obrero o empleado haya sido la única causa de la lesión."

Y en el citado caso de *Umpierre* v. *Comisión,* 52 D.P.R. 765, 768 y siguientes, esta corte por medio de su Juez Asociado Sr. Travieso, se expresó así:

"Para que el acto del obrero pueda ser calificado como imprudencia temeraria (*wilful misconduct*) y se le pueda negar la compensación, es necesario probar que el obrero actuó en contravención de órdenes expresas de su patrono y después de haber sido advertido del peligro que correría en la realización del acto prohibido. Así lo sostiene toda la jurisprudencia citada por el recurrente. Como ejemplos citaremos los siguientes casos:

" 'Lesiones resultantes de actos realizados en directa hostilidad y como un reto a las *órdenes positivas del patrono* referentes a instrumentalidades, sitios o cosas con respecto a los cuales el empleado no tiene obligación alguna que cumplir, y con los cuales su empleo no está relacionado, no son compensables.' (Itálicas nuestras.) *Dickey* v. *Pittsburgh & L. E. R. Co.,* 297 Pa. 172, 146 Atl. 543.

" 'Si un empleado va a un departamento que no es el suyo, y es lesionado mientras trata de realizar precipitadamente un trabajo que él está autorizado a hacer en su departamento, la lesión no ha sido recibida en el curso del empleo, *cuando existe una regla conocida por el empleado que restringe las actividades de los empleados a su propio departamento.'* (Itálicas nuestras.)   *Hyatt* v. *U. S. Rubber Reclaiming Co.,* 230 App. Div. (N. Y.) 743, 243 N. Y. Supp. 474.

" 'Un empleado que es lesionado en un departamento de la planta de su patrono, al cual, por razón del riesgo de que pudiera ser lesionado, *se le había dicho positivamente por sus superiores que no fuera,* no fué lesionado en el curso de su empleo; especialmente cuando fué a ese departamento a hacer trabajos para su propia conveniencia y para su beneficio pecuniario.'   (Itálicas nuestras.)   *Kasper* v. *Liberty Foundry Co.,* (1932) Mo. App. 54 S. W. 2d 1002.

"Los numerosos casos citados por el recurrente sostienen la doctrina de que un empleado es culpable de imprudencia temeraria (*wilful misconduct*) y pierde su derecho a ser indemnizado, cuando después de haber sido advertido por su patrono del peligro que corre realiza el acto prohibido y asume el riesgo de ser lesionado.   La imprudencia temeraria es algo más que la negligencia; envuelve la idea de una conducta cuasi criminal o sea la deliberada intención de realizar un acto prohibido con pleno conocimiento de sus probables consecuencias.   Véanse: *Clark* v. *Los Angeles Country,* 1 Cal. I. A. C.; *Haffenayer* v. *United Keanograph Film Mfg. Co.,* 1 Cal. A. C. Dec. 620.   El recurrente, al invocar esa doctrina como la applicable al caso de autos, dice en su alegato:

" 'La jurisprudencia ha llegado a sostener definitivamente en casos de esta naturaleza, que *un empleado que viola órdenes expresas de* su patrono y que sean dadas para su protección, se sale "del curso de su empleo," y si resulta lesionado, dicha lesión no ha sido recibida "en el curso de su empleo" ni "por motivo de su empleo" que son requisitos esenciales para determinar responsabilidad.'   (Itálicas nuestras.)

"Sostiene además la jurisprudencia que el peso de la prueba, cuando se alega imprudencia temeraria, descansa sobre el demandado; que la defensa no queda debidamente probada cuando hay duda sobre la deliberada y temeraria exposición al peligro; y que cuando la lesión causa la muerte, la evidencia debe ser clara e inequívoca y de tal grado que establezca la defensa más allá de toda duda razonable, por el hecho de que los labios del obrero, sellados por la muerte, no pueden hacerse oír en su propia defensa.   Véanse: *Hedges* v. *City of Los Angeles,*

1 Cal. I. A. C. Dec. 394; Honnold Vol. 1 pág. 568; *Freid* v. *Smith Lumber Co.,* 2 Cal. I. A. C. Dec. 117.

"Somos de opinión que el patrono en el caso de autos no ha establecido satisfactoriamente su defensa de imprudencia temeraria. Ya hemos hecho constar que la prueba aducida para establecer el hecho de que Villanueva había recibido órdenes expresas del patrono es insuficiente. No habiéndose presentado prueba clara e inequívoca de que el obrero fuera expresamente advertido del peligro, y considerando que dicho obrero se encontraba en el truck con el consentimiento del patrono, en funciones de su empleo de conducir piedra desde la cantera para entregarla en la obra, no estamos autorizados para presumir que el acto de tratar de pasar desde la piedra en que iba sentado al sitio junto al chófer fuera realizado por Villanueva con el propósito deliberado de violar las órdenes de su patrono y de asumir el riesgo de ser lesionado. Más lógica sería la presunción de que Villanueva tan sólo trataba de encontrar un asiento menos peligroso y más cómodo que el que su patrono le había asignado sobre la piedra. No hubo error en la aplicación de la ley a los hechos que la comisión consideró probados. No erró la comisión al resolver que el accidente ocurrió en el curso del empleo del obrero y que el caso es compensable de acuerdo con la ley vigente."

La propia Comisión recurrida admite que "ninguno de los testigos declaró haber visto a Luis Rodríguez Cardona durmiendo debajo del *truck.*" Eso no obstante, concluye que estaba acostado durmiendo debajo del *truck* porque tampoco "ninguno de los testigos pudo declarar en cuanto a dónde se encontraba" y porque llamado insistentemente y en alta voz, no respondió. Esto es, admite la Comisión que no hubo evidencia directa, pero sostiene que la hubo indirecta, del hecho esencial que declaró probado.

Repetidamente se ha resuelto que la evidencia circunstancial, indirecta o indiciaria es prueba suficiente y a veces de las más seguras, pero se ha agregado que es necesario que resulte incompatible con cualquiera hipótesis racional que pueda hacerse en relación con la inocencia del acusado. Y aquí en verdad la evidencia circunstancial es compatible con algunas otras hipótesis racionales aparte de la que consideró como única la Comisión. Pudo el obrero dejar de contestar

por otros motivos, siendo algo que llama la atención el que si estaba acostado durmiendo debajo del *truck,* no despertara con el ruido de la máquina ni fuera visto por el chófer cuando bajó a darle manigueta. El obrero pudo haberse separado momentáneamente del *truck,* pudo responder y no ser oído por el chófer debido al ruido de la máquina y pudo ser cogido por ésta en el instante de llegar a ella, al ser movida precipitadamente por el chófer a los fines de no perder su turno en la carga del azúcar.

■ Siendo ello así, creemos que la conclusión a que llegara la Comisión con respecto al único hecho que podría excluir este caso de la Ley de Compensaciones por Accidentes del Trabajo, carece de base legal. Si alguna duda existiera, debe resolverse en favor de la inclusión, dado el espíritu liberal en que la ley se inspira que tiende a no dejar sin protección al obrero o a los que de su trabajo dependían para su sostenimiento.

*Debe revocarse la resolución recurrida y devolverse el caso a la Comisión para que fije la indemnización que proceda de acuerdo con la ley.*

El Juez Asociado Sr. Wolf disintió.*