RAFAEL DE J. CORDERO, en su carácter de Administrador del Fondo del Seguro del Estado, recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, ETC., demandada, y SUCN. PEDRO MÉNDEZ, peticionarios ante la Comisión Industrial.

Núm. 258.—*Sometido:* Diciembre 7, 1942. *Resuelto:* Febrero 3, 1943.

*Hon. Procurador General Interino M. Rodríguez Ramos, y G. Atiles Moréu, Angel de Jesús Matos y Joaquín Correa Suárez, abogados los tres últimos del Fondo del Estado, abogados del recurrente; F. M. Susoni, Jr., abogado de los peticionarios ante la Comisión.*

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

Como a las once y media de la noche del ocho de enero de 1942 el obrero Pedro Méndez que trabajaba como engrasador de máquinas en la planta de Utilización de Fuentes Fluviales, ubicada en el barrio de Tanamá del municipio de Arecibo, fué encontrado muerto, carbonizado, frente a la caseta de pararrayos de la planta que encierra alambres de alto voltaje.

Practicada la investigación correspondiente, el Administrador del Fondo del Seguro del Estado concluyó que habiéndose comprobado que el obrero no tenía deber alguno que desempeñar en la caseta de pararrayos y siendo de conocimiento general de los empleados de la planta que entrar a dicha caseta era encontrar una muerte segura, el accidente no era uno de los protegidos por la ley, y en su consecuencia ordenó el cierre y archivo del caso.

Notificada la viuda del obrero Ramona Torres y por su conducto su hija de crianza Ramonita Soto, solicitaron de la Comisión Industrial que revisara la resolución del Administrador, alegando que estaba envuelto en el caso un accidente del trabajo compensable.

Celebrada la vista que ordena la ley, la Comisión declaró probado ''que el obrero Pedro Méndez trabajaba como engrasador en la planta eléctrica de la Utilización de Fuentes Fluviales en Arecibo; que no sólo engrasaba sino que limpiaba las máquinas, y toda la planta y limpiaba el piso; que dicho obrero apareció electrocutado el día 8 de enero de 1942, a las once y media de la noche de dicho día en la caseta de pararrayos de Utilización de Fuentes Fluviales en Arecibo; y que Pedro Méndez ese día tenía que trabajar en el turno

de las cinco de la tarde del día 8 de enero hasta las ocho de la mañana del siguiente día.''

Y basándose en esos hechos y citando varias decisiones de esta corte y de otras del continente, concluyó que el obrero había perdido la vida en un accidente que provino de un acto inherente·a su trabajo ocurrídole en el curso del mismo, y que, por tanto, era compensable.

Fué entonces que el Administrador del Fondo del Seguro del Estado pidió a esta corte que revisara la decisión de la Comisión. Librado el auto, vino el expediente original y tanto el Administrador como los beneficiarios presentaron alegatos, celebrándose la vista del recurso el 7 de diciembre último con la sola asistencia del Administrador.

Para que un accidente sea compensable según prescribe la ley y se ha resuelto por esta corte entre otros casos en el de *Montaner* v. *Comisión Industrial,* 53 D.P.R. 197, 199, citado por la propia Comisión, ''la lesión debe (*a*) ser el resultado de un acto o función inherente al empleo, (*b*) haber ocurrido en el curso del empleo, y (*c*) ser consecuencia del empleo.''

O como más elaboradamente se dice en *Archibald* v. *Ott,* 87 S. E. 791, 792, ''Para que surja el derecho a compensación un daño debe resultar o surgir como consecuencia del empleo. Las frases 'en el curso del empleo' y 'como consecuencia del empleo' no son sinónimas. La primera se refiere al tiempo, lugar y circunstancias del accidente, la última se refiere a su origen. *Fitzgerald* v. *Clark,* 1 B. W. C. C. 197; *McNicol's Case,* 215 Mass. 497, 102 N. E. 697. No es suficiente decir que el accidente no hubiera ocurrido si el obrero no hubiera estado empleado en el trabajo durante ese tiempo, o que no hubiera estado en ese sitio. Debe aparecer que resultó como consecuencia de alguna gestión que estaba realizando en el curso de su empleo, o como resultado de un riesgo particular a que el trabajo le expuso. *Amys* v. *Barton,* 5 B. W. C. C. 117.''

La Comisión acepta que ésa es la norma a seguir e insiste en que siguiéndola el caso debe resolverse en la forma en que lo hizo, de acuerdo con las peculiares circunstancias que en el mismo concurren y con lo sentado por la jurisprudencia en casos similares. Su razonamiento es como sigue:

"No hay prueba alguna de que el obrero voluntariamente se causare la lesión, ni de que estuviese embriagado, ni que la lesión le hubiese sido causada por una tercera persona, ni que la imprudencia temeraria del obrero haya sido la única causa de su muerte.

"Tampoco se ha alegado ninguna de estas circunstancias por el Fondo del Estado. Simplemente se alega por el Administrador que el accidente que motivó la muerte del obrero no fué consecuencia de su trabajo.

"El trabajo que hacía el obrero Pedro Méndez en la planta eléctrica lo ponía en condiciones de recorrer todos los sitios de dicha planta y estaba incidental o casualmente expuesto a los riesgos propios de una planta eléctrica.

"En el caso *Archibald* v. *Ott,* 87 S. E. 791, 792, 77 W. Va. 448, L.R.A. 1916 D 1013, se ha resuelto: 'Si existe relación incidental o causal entre el empleo y el accidente, la lesión se considera como que surgió del empleo, aún cuando la relación sea algo remota, y aún cuando el agente directo e inmediato de la lesión fuera extraño.' (71 C. J., pág. 653.)

"¿A qué fué el obrero a la caseta de los pararrayos donde fué electrocutado? Nadie lo sabe. Es significativo que una caseta donde existe tanto peligro, y donde fué electrocutado el obrero, esté cerrada, como dijo el testigo Manuel Guillán, solamente con una aldaba. Debería estar cerrada de tal manera que únicamente un empleado responsable y autorizado para ello pudiera abrirla.

"Se ha resuelto que cuando una persona es encontrada muerta, la ley imparte a las circunstancias, la significación, prima facie de que la muerte fué causada por un accidente más bien que por suicidio. Se sostiene que esta presunción persiste en su fuerza legal hasta que sea destruída por evidencia. *Milwaukee Western Fuel Co.* v. *Industrial Commission,* 159 Wis. 635, 150 N. W. 998; Honnold *on Workmen's Compensation,* Vol. 1, 1918, pág. 313.

"El administrador del Fondo del Seguro del Estado no probó, ni siquiera alegó que el obrero se suicidara."

De la evidencia aportada surge claro que el obrero trabajaba como engrasador de máquinas en la planta de su pa-

trono en el turno de la noche. A las seis comió con el operador de la planta y por él fué visto en ella como a las nueve y a las diez. Estaba contento. No revelaba preocupación alguna. Como a las once y media el operador notó humo. Observó y vió al engrasador recostado de la puerta que tiene la caseta de los pararrayos, con la mano derecha en uno de los alambres. Ya había muerto electrocutado. La caseta estaba fuera de la casa de máquinas, como a seis pies de la misma, sobre terrenos del patrono. Permanecía cerrada con una aldaba. Por el aparato que había dentro pasaban alambres de alta tensión, hecho que conocían los empleados de la planta. El obrero no tenía deber alguno que cumplir en relación con la caseta. No hay persona alguna que explique por qué o a qué salió el obrero de la casa de máquinas y fué a parar a la caseta donde encontró la muerte. Bajo esas circunstancias, ¿cae el caso dentro de la teoría de la relación incidental o causal entre el empleo y el accidente?

Esa teoría se expone y aplica en el ya citado caso de *Archibald* v. *Ott,* 87 S. E. 791, de la Corte Suprema de Apelaciones de West Virginia, invocado por la Comisión. La opinión es muy interesante e ilustrativa. De ella transcribimos lo que sigue:

"Si hay una relación causal o incidental entre el empleo y el accidente, se reputa que el daño es consecuencia del empleo, aún cuando la relación sea remota y el agente directo e inmediato del daño sea ajeno. El asesinato de un pagador, como incidente al asalto del funcionario, es un accidente que surge del empleo (*Nisbet* v. *Rayne and Burn,* [1910] 2 K. B. 689), porque el transportar habitualmente fuertes sumas de dinero en el curso del empleo y como un acto del trabajo, constituye una exposición al riesgo de ser atacado por salteadores. Un daño a un conductor de una locomotora, causado por una piedra lanzada por un niño mientras la locomotora pasaba bajo un puente, se sostuvo que constituía un accidente que surgía del empleo (*Chalis* v. *London & S. W. Ry. Co.* [1905] 2 K. B. 154), porque ese riesgo es un hecho de conocimiento general, y por tanto debió ser previsto por el patrono y el obrero. En cada uno de esos casos la agencia criminal, independiente del daño, se sostuvo que era

inmaterial, porque el riesgo del daño fué un incidente del cumplimiento de su trabajo, así como también del tiempo o lugar del empleo.

"Tales actos necesarios para la vida, comodidad y conveniencia del obrero mientras está en el trabajo, aunque lo sean estrictamente personales, y no actos del servicio, son incidentales a su labor, y un daño sufrido al realizarlos se reputa que ha surgido como consecuencia del empleo. Un hombre debe respirar y tomar agua a ratos, mientras está en su trabajo. En estos y otros momentos concebibles el obrero se atiende a sí mismo, pero en un sentido remoto estos actos contribuyen a la promoción del trabajo. *Vennen* v. *New Dells Lumber Co.* (Wis.) 154 N. W. 640; *Zabriskie* v. *Erie R. Co.*, 85 N. J. Law, 157, 88 Atl. 824. Que tales actos se realizarán en el curso del empleo tuvo necesariamente que tomarse en consideración, siendo incidentes inevitables. Esos riesgos concurrentes son, en consecuencia, riesgos incidentales. Al mismo tiempo daños ocasionados por ellos son accidentes que resultan del empleo.

"En este caso el inadecuado, insatisfactorio e indeseable sistema de suministrar agua era una de las condiciones generalmente reconocidas del lugar del trabajo. En consecuencia todos los obreros se abastecían del aljibe por medio de cubos y botellas que eran abandonados en sus respectivos sitios de trabajo, y, como bien debe suponerse, en vista del espíritu de compañerismo que comúnmente prevalece entre hombres que trabajan juntos, no era raro que un trabajador sediento tomara un trago, por permiso tácito, de cualquier balde o botella que estimare conveniente. Entre las botellas del edificio había una que contenía un veneno mortal que parecía agua. Su presencia allí era un incidente en la prosecución del trabajo. Era una substancia que allí se utilizaba, y no una cosa abandonada por un extraño en la propiedad (*premises*) del patrono. En la ejecución de un acto incidental a toda clase de empleo, Archibald, por error, bebió este líquido tomándolo por agua. Que su muerte fué accidentalmente ocasionada, en el curso de su empleo, se admite, y en nuestra opinión el accidente fatal surgió como consecuencia de su empleo. El caso es similar a varios que se encuentran en las decisiones. Un escogedor de lana se infectó a través de un bacilo que se encontraba en la lana que estaba escogiendo, muriendo de ántrax. Se sostuvo que el accidente había ocurrido en el curso del empleo y como consecuencia del mismo. *Brinton* v. *Turvey*, App. Cas. (1905) 230. Por casualidad un obrero de una mina de carbón fué obligado a permanecer bajo agua fría hasta que se resfrió, resultándole una pulmonía y muriendo. Se sostuvo que el daño podía atribuirse legalmente a un accidente sufrido en el curso del empleo, y que surgió como con-

secuencia de éste. *Alloa Coal Co.* v. *Drylie,* 4 N.C.C.A. 899. La muerte de un obrero por fiebre tifoidea contraída de agua contaminada suministrada por el patrono se resolvió que era un daño compensable dentro del significado de la Ley de Compensaciones. *Vennen* v. *New Dells Lumber Co.* (Wis.) 154 N. W. 640. Un obrero se hirió mientras descendía para almorzar del techo de un edificio, resolviéndose que el daño había surgido en el curso del empleo. *Clem* v. *Chalmers Motor Car Co.,* 178 Mich. 340, 144 N. W. 848. Un ingeniero naval encendió una estufa para calentar su camarote debido a un intenso frío, asfixiándose. A pesar de que él se administró la causa de la muerte, el accidente era compensable. *Edmunds* v. *S. S. Peterson,* 5 B.W.C.C. 157. Los siguientes casos que envuelven un servicio incidental personal sostienen lo mismo: *Morris* v. *Lambeth Borough Council,* 8 B.W.C.C. 1; *Leach* v. *Oakley, Street & Co.,* 4 B.W.C.C. 91. Si el calmar la sed de un obrero mientras está en su trabajo es un acto dentro de su trabajo, entonces indudablemente un error perjudicial en la ejecución de dicho acto es igual, en su naturaleza y carácter legal, que daños sufridos en el desempeño de cualquier otro deber. Una caída de un andamio, una herida accidental de una mano o un pie sufrida en el curso del empleo, aunque negligentemente, sería un accidente compensable. El beber agua en el curso del empleo es necesariamente un incidente del trabajo, y como surge de los hechos de éste y otros casos, envuelve algún riesgo. Este riesgo estaba dentro del conocimiento de las partes. Por tanto, el error fatal de Archibald en este servicio incidental, es legalmente igual que cualquier daño que hubiera sufrido como consecuencia directa del empleo. La única diferencia visible descansa en el hecho de que el tomar el agua fué un acto remoto, incidental e indirecto y no un acto directo de servicio al patrono, y las autoridades citadas estiman que esta diferencia es inmaterial.''

Examinados los hechos de este caso a la luz del criterio que informa la decisión de West Virginia y de las que en ella se citan, e interpretada como debe serlo liberalmente la ley (*Cardona* v. *Comisión Industrial,* 56 D.P.R. 847, 859), puede concluirse que existe la relación incidental o causal que permite colocarlo dentro del marco fijado por la ley para que sea compensable.

Descartada la teoría del suicidio que no cabe presumir bajo las circunstancias que concurren, la salida del obrero

tiene que atribuirse a la necesidad de realizar algún acto conforme a la naturaleza humana para poder continuar cumpliendo los deberes de su empleo, y a la casualidad su contacto con los alambres de los pararrayos que allí tan cerca e insuficientemente resguardados, tenía el patrono. No debe olvidarse que era de noche. Tampoco que cualquier ser humano aparte de que debe satisfacer necesidades periódicas normales, puede enfermar súbitamente y perder total o parcialmente el uso de sus facultades para defenderse del peligro y por tanto que constituye una explicación razonable que en tales condiciones el obrero sin darse cuenta plena de lo que hacía se acercara o cayera sobre la caseta agarrándose del alambre y perdiera su vida a virtud de la corriente eléctrica que por él pasaba. Esa corriente fué instalada por su patrono para beneficio del negocio que explotaba y fué en el curso y como consecuencia de su empleo que el obrero se puso en contacto con ella, siendo un acto inherente al empleo que el obrero saliera de la casa de máquinas a respirar o a satisfacer cualquiera otra necesidad orgánica para continuar cumpliendo su deber.

Se dirá que existe una marcada diferencia entre los hechos del caso de West Virginia y los de éste que estamos considerando porque aquí la corriente de alto voltaje era un riesgo común al público en general.

En efecto la prueba tiende a demostrar que tal como estaba situada la caseta de los pararrayos podía constituir un riesgo para cualquier persona que por allí pasara y tocara los alambres, sin necesidad de que esa persona tuviera que ser un empleado, pero si bien la jurisprudencia ha resuelto que "un daño resultante de un riesgo al que todos están expuestos no surge como una consecuencia del empleo," ha agregado "a menos que el empleado lo haya estado en un grado mayor que otras personas." Véase 71 C. J. 653, especialmente la nota que aparece a la página que sigue y que dice:

La prueba (*test*) para determinar si las lesiones sufridas por un obrero surgieron en el curso del empleo, es resolver si la naturaleza del empleo era tal que el riesgo del cual resultó la lesión era mayor para el obrero que para una pesona no ocupada en el empleo. *Myers v. Louisiana Ry. & Nav. Co.*, 74 So. 256, 140 La. 937; *Keyhea v. Woodward-Walker Lumber Co.*, (La. App.) 147 So. 830." 71 C. J. 654.

Y aquí es aparente que el riesgo era mayor para el empleado que para el público en general.

Parece conveniente agregar que no es por vez primera que se aplica por esta corte la teoría del riesgo incidental para concluir que el accidente es compensable. Véanse entre otros los siguientes casos: *Montaner, Admor.* v. *Comisión Industrial*, 55 D.P.R. 900; *Montaner, Admor.* v. *Comisión Industrial*, 55 D.P.R. 400; *Umpierre* v. *Comisión Industrial*, 52 D.P.R. 765, 770, y *Montaner, Admor. etc.* v. *Comisión Industrial*, 50 D.P.R. 628.

*Por virtud de todo lo expuesto opinamos que debe declararse no haber lugar a dejar sin efecto la decisión de la Comisión Industrial recurrida.*