Dolores Cabrera Vda. de Meléndez y otros, recurrentes,
v. Comisión Industrial, recurrida; Fondo del Seguro
del Estado, interventor.

Número: 557    Resuelto: 16 de marzo de 1962

*Hernán Morales Landrau,* abogado de la recurrente Dolores Càbrera Vda. de Meléndez; *Donald R. Dexter* y *Carmen Ana Archeval,* abogados del Fondo del Seguro del Estado.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El obrero Ismael Meléndez Mateo sufrió una caída desde el techo de una casa a una altura de 12 pies más o menos mientras trabajaba. El accidente ocurrió el 31 de agosto de 1956. Ese mismo día fue hospitalizado y el 18 de septiembre se le dio de alta por el Fondo del Seguro del Estado. En 1ro. de octubre el Fondo ratificó dicha alta y el obrero apeló a la Comisión alegando que no podía trabajar. Se le examinó en vista médica el 22 de octubre y en esa fecha el Fondo lo consideró curado sin incapacidad. En 13 de noviembre se le examinó de nuevo en vista médica y se envió el caso al Fondo para nuevas placas del tórax. Volvió a ser examinado el 14 de noviembre y en 23 de noviembre de 1956 la Comisión resolvió que el obrero había curado sin incapacidad. Unos tres meses y medio después, el 16 de marzo de 1957, falleció. Tenía la edad de 49 años.

El Fondo del Seguro negó compensación a su viuda y otros dependientes en mayo 1 de 1958. En 29 de agosto de 1958 la Comisión recurrida falló confirmando al Administrador, negando compensación por esta muerte. Ese fallo está ahora ante nuestra consideración.

No hay contienda sobre la dependencia. Tampoco la hay en cuanto a que el obrero, de oficio albañil, sufrió la caída desde el techo de esa casa en el curso de su empleo trabajando para la Fullana Construction Corporation. El caso gira fundamentalmente en torno a la relación causal entre la muerte y el accidente del trabajo. En este recurso se ataca la conclusión de la Comisión recurrida, que se basó en

la prueba médica, en el sentido de que la muerte nada tuvo que ver con el accidente. Es inevitable, por lo tanto, una exposición en detalle de la evidencia en el récord.

El Dr. Andrés Meléndez declaró que el obrero fue hospitalizado en su clínica, enviado por el practicante José Santana, el 31 de agosto de 1956—día del accidente—debido a múltiples contusiones que había recibido en la cabeza, región torácica, cadera derecha y en ambos brazos. Se le tomaron placas radiográficas de la cabeza, del pecho para costillas, de la cadera y los brazos y las mismas fueron negativas de fractura. Demostraron que el obrero tenía una severa torcedura de la espina dorsal que no fue producida por el accidente y constituía una deformidad congénita. Al obrero se le dio un tratamiento de aspirina y bolsas de hielo y relativamente no estaba tan malo ni en momento alguno demostró gravedad. Al ingresar lo más que se quejaba era que le dolía el *pecho* y la *cabeza*, los brazos y la cadera. Su presión arterial era de 100/60. No le hicieron examen de orina o de sangre porque no lo hacen a menos que lo requieran. Encontraron únicamente la deformidad de la cifosis o torcedura y se refirió el Dr. Meléndez al texto de la siguiente nota de la Técnica de Rayos X: "Este paciente tiene cuerpo deforme y le imposibilita para cooperar para tomarle placas." Explicó que en vez de estar derechas las cervicales hacían un arco de 90 grados hacia la izquierda y otro ángulo hacia la derecha formando una cifosis. En cuanto al hígado manifestó el Dr. Meléndez que no notó anormalidad alguna. No volvió a ver a este obrero después que abandonó la clínica.

Un testigo de nombre Pedro Ángel López declaró que diariamente él llevaba al trabajo al obrero y lo traía a su casa en su automóvil hasta el día del accidente. Después lo vio que no podía trabajar, estaba con los ojos brotados y se volvía hasta loco, explicando que veía que muchas veces corría a sus hijos y una noche los botó de la casa para abajo.

La viuda declaró que hacía 22 años que estaba casada con el obrero; que lo consideraba saludable porque era un hombre que no perdía ni un día de trabajo; después del accidente quedó bastante mal porque no podía trabajar; que el día de la muerte lo llevó al "Distrito" porque se encontraba con un dolor grande y le dieron cita para que lo dejara el día 21 ó 22 y ella lo trajo a su casa muriendo como dos horas más tarde. Explicando el estado del obrero después de la caída dijo que antes del accidente él era un ser que nunca le gustaba que se hablara duro "y después del accidente llegó tirando por la ventana y rompiendo todo y botándonos de la casa." A ella le costaba irse a la calle con sus hijos. Él se ponía las manos "así" y de momento decía que qué le pasaba a él que porqué los había echado para abajo. El hombre estaba mal y se encontraba triste porque no podía trabajar. Él decía a sus hijitos que le daba pena verlos pasando hambre y él no podía trabajar. Se le pusieron los ojos negros y eso él no lo tenía y por dentro los tenía colorados y brotados para afuera. Desde que se dio esa caída él "no sirvió para más nada." También declaró la viuda que el obrero iba al médico cada seis meses a sacarse placas y nunca le habían dicho que padeciera del corazón. No faltaba al trabajo a menudo.

El Fondo del Seguro presentó el testimonio del Dr. Carlos Eugenio Timothée, especialista en enfermedades del corazón. Declaró que el 6 de marzo de 1957 el obrero fue al Hospital de Distrito de Bayamón y fue visto en la clínica sobre cardiología dirigida por él. Del examen se llegó a la conclusión que el paciente padecía de "cor pulmonale" que quería decir un corazón que estaba afectado por una condición del pulmón. Encontraron también que el paciente tenía una hipertensión de la arteria pulmonar. Explicando las causas que ocasionan el "cor pulmonale" el Dr. Timothée manifestó que el "cor pulmonale" crónico como era el de este caso, era causado por asma bronquial, enfisema, o por enfer-

medades debilitantes del pulmón; en otros casos, por una enfermedad pulmonar; en otros, debido a una endarteritis pulmonar que quería decir inflamación de la parte de adentro de la arteria pulmonar, y en la mayor parte de los casos, cuando hay una deformidad grande del tórax como por ejemplo, un pecho excavado o *"kiphoscoliosis"*. Dijo que la *"kiphoscoliosis"* ocasiona el "cor pulmonale" porque causa una deformidad tan enorme en la pared torácica que el corazón crece oprimido, no da la expansión del corazón como debe tener y por lo tanto no hay la capacidad vital del corazón ni de los pulmones. Explicando que ambos órganos trabajan al unísono, uno purificando la sangre y el otro la bombea, al estar la caja del pecho con una deformidad tan enorme hay otra compresión sobre los pulmones y sobre el corazón y entonces el corazón trabaja con una desventaja enorme, quitándole muchos años de vida a la persona, bajando el promedio de vida enormemente. Las personas que tienen la *"kiphoscoliosis"* causando el "cor pulmonale" viven **mucho** menos que lo que vive una persona normal en igualdad de condiciones. Siguió explicando el Doctor que se le hicieron a este obrero los estudios de placas, electrocardiografía, exámenes de orina; el paciente no fue ingresado, y después no volvió más. Explicó una nota en el récord de que se había referido al paciente a la Unidad de Bienestar Público para ayuda económica porque lo más que le interesaba era ayuda económica "porque se sentía mal y no podía trabajar". Declaró el facultativo que el informe de la placa radiográfica decía que la imagen en el pulmón derecho e izquierdo indicaba "exageración en el estroma(\*) acusando congestión pulmonar" y que había presente una *"kiphoscoliosis"* exagerada. Diez días después de este examen falleció el obrero.

Se le informó al perito sobre la caída del obrero, las contusiones que recibió y su muerte unos 196 días después, y

---

(\*) *Casares*.—Trama o armazón de un tejido que sirve para el sostenimiento de los elementos celulares.—Diccionario Ideológico.

requerida su opinión ante esos hechos en cuanto a relación causal entre la muerte y el accidente sufrido, el Dr. Timothée contestó:

"No creo que haya relación entre el accidente y la muerte del obrero. Motivos: El obrero sufrió un trauma. Este trauma no fue lo suficiente para causarle patología ósea, según las placas. Sabemos que para que un trauma en una persona mayor afecte al ventrículo derecho debe haber fractura de costillas, debe haber rasgaduras de la pleura, o debe haber punción del pulmón. En este caso no se han llenado esos requisitos patológicos.[1]

"P.—¿Entonces usted cree, Doctor, que el accidente sufrido por el obrero en nada tuvo que ver con su muerte y que hubiese muerto independientemente de haber sufrido trauma alguno, con su deformidad que tenía en su cuerpo?

"R.—Creemos eso. Y la historia del paciente al ir al hospital de Distrito: Se le atiende, pide ayuda económica y después se va y a los diez días muere. Nos parece que es el panorama de todos estos enfermos del corazón que tienen el mal en su estado final.

"P.—¿Y en relación con el tiempo que transcurrió, o sea, 196 días, entre el accidente y la muerte del obrero?

"R.—En un trauma que hubiese damnificado el corazón la muerte sería rápida.

---

[1] Aquí el Dr. Timothée citó para el récord el siguiente pasaje de un libro del Dr. Paul D. White sobre enfermedades del corazón, que por ser materia profesional preferimos no traducir.

"Thoracic and Spinal Deformities: An appreciate and sometimes serious handicap to the action of the heart and circulation may be occasioned by deformities of the thorax or spine, particularly marked kiphoscoliosis. The strain, however, may be more pulmonary than cardiac with such diminished vital capacity of the lungs, but almost always both systems, respiratory and circulatory, are involved with resultant pulmocardiac failure (Chapman, Dill & Graybiel, 1939). The heart may be displaced (to the left with right scoliosis and to the right with left scoliosis) and deformed and the great vessels compressed so that left ventricle or right ventricle, or both, may have increased work to do, with resulting hypertrophy and dilatation. Or the restriction of thoracic movement in respiration may result in special strain on the right ventricle, such as occurs in the case of the cor pulmonale. In badly deformed individuals survival or old age is frequently prevented by the cardiovascular strain as well as by pulmonary complications."

"P.—¿Usted cree que él hubiese podido sobrevivir?

"R.—De ninguna manera. No hubiera podido sobrevivir con ese pecho y una fractura en esa caja torácica, con un golpe al ventrículo derecho o afectando el pulmón, o haciendo compresión sobre los grandes vasos. Eso hubiera sido una condición incompatible con la vida."

A preguntas de la reclamante: "P.—¿En su opinión la muerte del obrero no tuvo nada que ver con la caída que sufriera el obrero? R.—¿La muerte del obrero? P.—¿No era consecuencia de la caída que sufriera? R.—Yo estoy hablando de la parte del corazón. El corazón no fue afectado por la caída. P.—¿Entonces usted quiere decir que la caída no le afectó el corazón? R.—En otras palabras, su muerte del corazón por un proceso cardio-respiratorio hubiera ocurrido con o sin la caída." También explicó que la presión que hacía la caja del pecho en el corazón subía la presión intra-pulmonar del obrero; que ésta no se mide porque necesitaría una investigación demasiado difícil, se sabe por la sistomatología; él tenía hipertensión pulmonar.

Preguntado por la Comisión sobre la condición del hígado comparada con la condición que expusiera el Dr. Meléndez, el facultativo expresó que no encontraron que tuviera patología alguna, sólo estaba lo recrecido que está en todo caso de enfermedad del corazón; en casos de enfermedad del corazón en que sufre el ventrículo derecho hay congestión pasiva del hígado porque la sangre no sigue hacia adelante, fluye hacia atrás y congestiona ese órgano. En cuanto a si esa condición podía ser consecuencia del trauma sufrido explicó que este hombre tenía un pulmón afectado por la compresión en que había estado toda la vida y un corazón que estaba trabajando más de la cuenta debido al encajonamiento en que toda la vida había estado, y el hígado también entraba en el panorama como parte de un mecanismo sincronizado. Preguntado entonces si esa condición que él encontró pudo haber sido precipitada por el accidente, contestó: "Si el

lesionado hubiese tenido sintomatología alguna aguda, a raíz del accidente, que hubiese muerto a raíz del accidente, nosotros podíamos pensar que había tenido el accidente que ver con eso. Pero desde el momento que han pasado 186 días, seis meses, y que no ha habido punción del pulmón, que no ha habido rasgadura de la pleura, ni fractura de costillas, ni ninguna evidencia que nos indique que fue una conmoción fuerte la que sufrió esa caja torácica, nosotros estamos obligados a llegar a la conclusión que el accidente no fue la causa de la muerte."

El Director Médico de la Comisión Dr. Vázquez Milán, expuso que el caso era algo obscuro considerando que no tenían la ayuda de una autopsia ni información de estudios radiológicos o de laboratorio que corroboraran los puntos obscuros tales como la condición hepática, ya que el doctor Meléndez (a raíz del accidente) había encontrado dicha condición hepática negativa y en un informe del Hospital de Distrito se decía que existía un engrosamiento de dos dedos por debajo del reborde costal derecho. Se refirió el Doctor a la deformidad congénita del obrero pero observó que hasta esa edad de 49 años el obrero trabajaba rindiendo una labor de ocho horas diarias sin historial de hospitalización para tratamiento de alguna enfermedad. Sabían médicamente que su fisiología cardiovascular tenía que estar afectada dada la naturaleza de la arquitectura ósea de su esqueleto, pero no había dado señales de alterarse esa fisiología toda vez que lentamente se había ido compensando con el desarrollo físico de la persona, llegando tal vez al máximum de sus funciones sin dar muestras de alteración aparente. Que había un historial de trauma, que el obrero cae de esa altura de 12 pies del techo de una casa y sintió dolor en el pecho y la cabeza y extremidades superiores. Se le había dado de alta basándose en que los estudios radiográficos eran negativos de patología ósea traumática; en verdad él tenía una patología ósea muy grande en su espina dorsal y arcos costales

por la deformidad congénita "del tipo pecho de paloma", por la cifo-escoliosis señalada.

Siguió exponiendo el Director Médico de la Comisión que la patología alegada por el obrero durante el tiempo desde la caída hasta su muerte fue la misma, y quedaba para el médico clínico determinar si esto era una condición mental. De ser una cuestión mental post-traumática, que fuera señalada por uno de los médicos como un estado de sicosis compensatoria,(2) podría alegarse de no haber nada clínico, que vino una condición mental precipitada. Y continuó: "Ahora, desde el otro ángulo, es algo patofisiológico que no tiene explicación clínica, que no haya podido dar el compañero Dr. Timothée ni ningún otro médico por experto que fuera, que condicionaría ese estado agudizando su condición preexistente, aumentando su incapacidad, hasta llevarlo unos días o meses después a su muerte, por agravación, si el otro aspecto queda sobre la mesa. Hay dos aspectos: uno compensando al obrero desde el punto de vista de agravación. . . . Por eso digo que queda sobre la mesa que se compense desde el punto de vista de agravación. Por el tamaño del hígado encontrado en el día del examen y de la hoja clínica del Dr. Timothée, como Director del Centro Cardiológico del Hospital de Distrito, había engrosamiento marcado del hígado, como corresponde a todos esos casos de 'cor pulmonale'. Esas son dos cosas que caminan paralelas. La fisiología del corazón alterado por la presión hacia atrás de la circulación, no hacia alante como en los casos de hipertensión, sino que hay presión, que empuja hacia atrás y el hígado se congestiona. Por eso es que caminan pareadas la condición de 'cor pulmonale' con la hipertrofia hepática. Esa condición hepática no pudo haber sido encontrada anteriormente a raíz de su accidente por el Dr. Meléndez, quien

---

(2) Anotación de sicosis de compensación hecha en el récord clínico por un médico interno del Hospital de Distrito, de lo cual discrepó el Dr. Timothée.

le hiciera el examen físico. Luego, se pudo haber agudizado o precipitado en el término de meses después del accidente. ¿O es que era una condición que era el evento final de su vida? Si era el evento final de su vida, no es compensable en el sentido de su muerte. Pero había el otro aspecto. El aspecto de que si el obrero estaba exagerando, fingiendo una condición que no existía, era una neurosis de compensación producida por el trauma. Para mi es una condición compensable."

A preguntas del Fondo de si el obrero falleció debido a una condición hepática el Doctor indicó que el certificado de defunción contestaba que murió de enfermedad del corazón; la condición hepática era más bien secundaria, no la causa de muerte directa, pero que como se menciona "cor pulmonale" había que señalar eso porque es la forma en que el clínico "mide el grado." "P.—Una persona que aparece como muriendo de una condición cardíaca, ¿qué importancia tiene que tenga un hígado más congestionado o no, si esa no es la causa directa de la muerte? R.—Su vida depende del tamaño de ese hígado. Porque un hígado tremendamente grande con un corazón que aparentemente esté funcionando regular, es malo. Sin embargo un corazón puede estar bastante mal y si el hígado está bien, puede vivir más."

Expresó el Dr. Timothée, llamado de nuevo a declarar, que viendo un caso de "cor pulmonale" no le daría importancia a la condición hepática porque era una condición *per se*. Tenía que haberla, era parte del proceso patológico. "Al paciente se le encontró en el Hospital de Distrito de Bayamón esa hipertrofia, esa congestión pasiva del hígado. Cuando él fue al Hospital de Distrito ya [en] él estaba mucho más adelantado el proceso patológico que la vez que se examinó anteriormente. Tan es así, que murió solamente diez días después." Según su opinión la cuestión era si la deformidad torácica durante tantos años insultó o no a ese corazón de manera que acabó con la vida del paciente, obser-

vando que el lesionado estaba llegando a los 50 años y que es muy raro el paciente del corazón que pasa de esa edad habiendo tenido una enfermedad durante muchos años; la muerte del lesionado se debió a una condición cardio-respiratoria causada por la sobrecarga que tuvo ese corazón, especialmente ese ventrículo derecho durante tantos años. Finalmente manifestó que no creía que la capacidad mental del obrero estuviera afectada; no creía que las quejas del obrero de que se había dado un golpe y no podía trabajar fuera una sicosis de compensación post-traumática. Era "la condición natural de todo ser humano que recibe un golpe en una parte que está ya herida o enferma hace muchos años" . . . . . "El sicótico es una obsesión. Él no sabe hablar más que de eso. Dice que si está inútil; que si no puede trabajar porque le da tal cosa. Que todo lo lleva, lo relaciona al golpe ese. Ahora, si el hombre se siente dolor en el pecho, o se siente fatigoso y dice: 'esto debe ser del golpe que me di'. Eso no es sicosis."

A ese respecto, el Dr. García Estrada fue de opinión también que no les impresionó que el obrero tuviera alguna enfermedad mental, no notaron al darlo de alta problemas emocionales, neurosis, sico-neurosis que tuviese. En todo el trayecto del caso no vio sicosis. Sí les impresionaron las placas.

El Dr. Plácido Torres certificó la muerte del corazón. Su testimonio no ha sido elevado en el récord pero según lo resume la Comisión, el Dr. Torres no asistió al obrero ni lo conoció en vida, y certificó la muerte a base de información suministrada por la familia del occiso.

Ese es el cuadro que en criterio médico nos presenta este caso, en que la Comisión concluyó:

"El obrero sufrió su accidente el 31 de agosto de 1956, y toda vez que las placas radiográficas no demostraron evidencia de patología ósea alguna en la cabeza, ni en el pecho, brazos ni caderas, después de tratamiento adecuado, fue dado de alta de la Clínica el 18 de septiembre del mismo año, y le expidieron

un alta para trabajar y recibir tratamiento en horas no laborables, el 28 del mismo mes y año. Este alta fue confirmada por esta Comisión. Posteriormente, con fecha 22 de octubre de 1956 el obrero fue dado de alta curado y sin incapacidad, alta que también fue confirmada por nuestra resolución de 23 de noviembre de 1956, después de haberse ordenado nuevos estudios radiográficos de la columna vertebral, cuyos resultados fueron negativos.

"Esto ocurrió en 23 de noviembre de 1956. No supimos más del obrero. No acudió nunca más ni al Fondo del Seguro del Estado ni ante nosotros a hacer alegaciones de clase alguna, y no fue hasta el 14 de marzo de 1957, o sea, alrededor de cuatro meses después que el obrero acude al Hospital de Distrito de Bayamón donde fue examinado por el Dr. Carlos E. Timothée, cuya brillante y clara exposición de la condición en que encontró al enfermo, nos ha dado suficiente luz para resolver este caso.

"Dijo dicho perito médico que la condición de deformidad torácica congénita que padecía el obrero presionaba su corazón y sus pulmones, en forma tal, que su muerte podía ocurrirle en cualquier momento, con o sin caída.

"Luego de analizar toda la prueba médica, somos de opinión que el accidente que sufriera el obrero nada tuvo que ver con su muerte, ni agravó una condición preexistente que presionara dicho desenlace, sino que el mismo se debió a causas naturales debido a su condición."

Si algo demuestra sin lugar a dudas el testimonio médico en el récord, en las circunstancias de este caso, son las dificultades con que a menudo habemos de encontrarnos para resolver, bajo criterios que no son de la particular preocupación del clínico, casos de esta naturaleza de compensaciones del trabajo. Se certificó una muerte por enfermedad del corazón por un médico que no asistió al paciente ni lo conoció en vida. No hay una autopsia que demuestre de manera conclusiva la causa de que este obrero dejara de existir el día ése. No hay el beneficio de un examen *post mortem* de sus pulmones y de su corazón, órganos éstos que según el récord ofrecían particularmente un historial en la condición de vida de esta persona. Se sabe de cierto que diez días

antes de morir se le diagnostica un corazón afectado por una condición pulmonar—"cor pulmonale"—crónica, que se atribuye a la deformidad congénita del obrero en su conformación torácica; y también se diagnostica hipertensión de la arteria pulmonar. Se sabe de cierto que para esta fecha el examen radiográfico demuestra que la imagen en el pulmón derecho e izquierdo indicaba exageración en el estroma acusando congestión pulmonar. Y se sabe también que el obrero había sufrido una caída de más o menos **doce** pies de altura desde el techo de una casa y de hecho, no trabajó más. ■

Abundando en las dificultades, no hay en el récord una descripción de cómo fue la caída del obrero, la posición de su cuerpo al chocar abajo o qué parte recibió el grueso del golpe. En el examen al ser ingresado a raíz del accidente se quejaba de dolor en la cabeza y en el pecho. No obstante el dolor de pecho, y aparecer su defecto torácico, no se le hizo entonces examen de sangre ni de orina, ni electrocardiograma, ni hay informe radiográfico del corazón ni de la condición de los pulmones particularmente todo lo cual pudo haber sido de mucha ayuda, como base de comparación con el estado que presentó el obrero ya cercana la muerte, en la determinación de si con el accidente se desarrolló o no una *agravación de su condición desfavorable pulmonar y car-díaca crónica*, o de si el accidente pudo ser, si se permite el símil, el agente catalítico que aceleró esa condición a un desenlace final. De la falta de prueba pericial que hubiera permitido hacer conclusiones—a los médicos inclusive—sobre bases menos conjeturales en cuanto a relación o no entre la caída y la muerte sobrevenida en fecha no tan remota a aquélla, no podría hacerse responsable al obrero, ni tomarse la falta de estos elementos de juicio para inferir de manera a él desfavorable. El obrero se sometió al Fondo. A éste competía hacer las averiguaciones y disponer los exámenes apropiados que hubieran podido indicar en su día, en las

circunstancias de este caso, que el trauma no pudo bajo concepto alguno agravar su condición preexistente precipitándola a un proceso final que acabara con la vida. Aparentemente la preocupación del Fondo asegurador se circunscribió a la existencia de fractura ósea, y no habiéndola, se le dio de alta como curado. ■

La prueba médica convence a satisfacción que la caída no causó *de manera directa* el fallecimiento, por ausencia de aquellos requisitos patológicos que hubieran sido necesarios según los enumerara el Dr. Timothée, y que de haber estado presentes, en opinión del distinguido cardiólogo hubieran creado una condición incompatible con la vida y la muerte habría sido rápida. La prueba que hay en el récord, ya que pudo haber otra que ayudara en un sentido o en otro, no convence a satisfacción a la luz de las normas de derecho en que deben resolverse estos casos que el accidente no agravara de tal forma la condición crónica del corazón y los pulmones del obrero producto de su deformidad congénita, acelerándole el proceso y llevándolo a la muerte en no muy lejano tiempo después, según concluyó afirmativamente la Comisión recurrida. Aunque a nuestro juicio el Dr. Timothée fundamentalmente se refería a que no hubo una muerte *directamente* causada por la caída cuando contestaba que no existía relación entre el accidente y el fallecimiento del obrero y que éste habría de morir del corazón por su condición congénita, el facultativo en momento alguno afirmó categóricamente que no pudo haber una agravación de su estado, o una merma de su tiempo de vida cualquiera que éste fuera. Aun cuando estuviéramos equivocados en la interpretación de su testimonio, el récord siempre demostraría, cuando menos, una discrepancia de criterio médico sobre este particular.(³) ■

---

(³) El Fondo compareció ante nos y sometió el caso descansando en la prueba desfilada ante la Comisión.

Ni la Comisión, ni nosotros, somos juzgadores versados en las ciencias médicas. De ahí que no nos es dable asumir aquí el papel del "tercer perito" y meramente seleccionar. Hay que pesar los criterios en discrepancia, honestos, a la luz de todos los factores de juicio extrínsecos al alcance, razonables y lógicos, con independencia de los elementos mismos en conflicto. (4) Al evaluarse estos factores hay que tener en cuenta una realidad patente. El Fondo Asegurador, como fondo social de un servicio social que impone la comunidad moderna, no es selectivo porque las filas del trabajo no se nutren, como las de combate, bajo normas selectivas de excelencia de salud. Como asegurador, el Fondo toma al obrero como sea, desarrollado o deforme, saludable o enfermizo. Así, al pesar los hechos y circunstancias de este caso y formar juicio debemos partir, no del efecto que hubiera tenido esa caída en una persona normal y en buena salud, sino cuál tenía que ser su efecto en una persona con el defecto físico y en las condiciones precarias del corazón y los pulmones, de este obrero. Otro criterio distinto desvirtuaría la filosofía misma de este seguro del trabajo porque tendería a limitar sus beneficios sólo a aquel sector obrero que al tener un accidente gozara de un perfecto estado físico. ■

Hay un hecho aparte de los puntos médicos levantados por el Dr. Vázquez Milán que no puede ser ignorado, apelando a la razón. Con su deformidad congénita y la condición crónica del corazón y sus pulmones este obrero trabajaba normalmente sin un historial de hospitalización. Luego de la caída no pudo trabajar más. Los propios médicos del Fondo descartaron una condición emocional en la queja del obrero de no poder trabajar; una ansiedad o neurosis de compensación. El Dr. Timothée se refirió a su

---

(4) Como dijera Pound, el derecho crece por la aplicación judicialmente de la razón a la experiencia. *"Reparation and Prevention in the Law of Today"*. 12 N.A.C.C.A. Law Journal, pág. 197.

situación como la condición natural de todo ser humano que recibe un golpe en una parte que está ya herida o enferma hace muchos años. Si no había una actitud mental consciente o inconsciente del obrero, lógicamente cabe pensar que entonces si se quejaba y no pudo trabajar más se debía a un impedimento orgánico creado, o agravado, por el accidente. Ése y otros hechos en el récord en conjunto, permiten una razonable inferencia de relación entre la caída y la incapacidad y muerte que sobrevino. (5) Cuándo en realidad habría muerto este obrero sin ocurrir el accidente, Dios lo sabría.

En ocasiones de algún parecido hemos dado el beneficio de una situación así al obrero. Cf: *Cardona* v. *Comisión Industrial*, 56 D.P.R. 847; *Colón* v. *Comisión Industrial*, 59 D.P.R. 850; *Cordero* v. *Comisión Industrial*, 60 D.P.R. 873; *Cordero, Admor.* v. *Comisión Industrial*, 61 D.P.R. 361; *Vélez* v. *Com. Industrial*, 73 D.P.R. 181. Hemos estado examinando las decisiones publicadas de la propia Comisión recurrida y ésa ha sido en el pasado también su actitud, respondiendo a las normas de aplicación liberal hacia el obrero de este sistema socialmente remediador y humanitario. Sería prolijo señalar esos casos específicos. "El costo del producto debe cargar con la sangre del obrero", expresión ésta que se le atribuye a Lloyd George.

Aparte de la doctrina generalmente seguida nuestro Legislador, en legislación enmendatoria del año 1957, y

---

(5) Interesante es la relación de situaciones que analiza el Dr. P. Boas, en su libro *"Cardiac Injury Resulting from Effort or Trauma: Clinical & Legal Aspects"* (1955) particularmente el capítulo "Injury to the Myocardium and Coronary Arteries induced by *non-penetrating blows to the chest* and by indirect insults", pág. 55 y el capítulo *"Myocardial infarction induced by a fall"*, pág. 65. También: *Injury and Heart Disease—Legal Aspects,* artículo del Dr. R. W. Kissane en 15 Ohio State Law Journal, (1954), pág. 409.

apuntando ya específicamente a la relación causal entre el trabajo u ocupación y la lesión, incapacidad o muerte, dispuso que cualquier duda razonable sobre la existencia de tal relación causal que surgiere en la aplicación del estatuto deberá resolverse a favor del obrero o empleado o sus beneficiarios.(6) Ello equivale a decir que la falta o ausencia de relación causal entre el trabajo y la lesión, incapacidad o muerte que derrota la compensación debe surgir del récord más allá de cualquier duda razonable. Este concepto de duda razonable rige la conciencia del juzgador al adjudicar los derechos legales de las partes; no ata al médico en sus conclusiones netamente periciales. ■■■■

Duda razonable es una duda con fundamentos de razón, no meramente caprichosa. A la luz de todos los hechos y circunstancias de este caso según surgen del récord, existe una muy fundada y razonable duda en cuanto a que la caída del obrero, de por sí un accidente compensable, nada tuvo que ver con su muerte ni tampoco agravó una condición preexistente que presionara dicho desenlace, como afirmativamente concluyó la recurrida. El récord no demuestra tampoco, más allá de cualquier duda razonable, la ausencia completa de relación entre el trabajo del obrero y su fallecimiento.

*Se revocará la resolución recurrida, se devolverá el caso y se compensará esta muerte.*

(6) Ley 94 de 22 de junio de 1957. 13 L.P.R.A. Sup. Acum. pág. 6. "Esta ley por ser de carácter remedial se interpretará liberalmente, y cualquier duda razonable que en su aplicación surgiere en cuanto a la existencia de relación causal entre el trabajo u ocupación del obrero o empleado y la lesión, incapacidad o muerte, o el carácter ocupacional de una enfermedad, deberá resolverse a favor del obrero o empleado, o sus beneficiarios."