ABNEY and EAVES, Inc., and the Standard
Insurance Company, Petitioners,

v.

Eugenie REDEKER and the State Industrial
Commission, Respondents.

No. 37092.

Supreme Court of Oklahoma.

Oct. 16, 1956.

Rehearing Denied Nov. 13, 1956.

Looney, Watts, Ross, Looney & Nichols, Oklahoma City, for petitioners.

Cargill, Cargill & Chiaf, Oklahoma City, Mac Q. Williamson, Atty. Gen., for respondents.

WILLIAMS, Vice Chief Justice.

On December 18, 1954, Eugenie B. Redeker, respondent herein, filed a claim for compensation against Abney and Eaves, Inc., and its insurance carrier, Standard Insurance Company, petitioner herein, stating that while in the employ of petitioner, Abney and Eaves, Inc., she sustained an accidental injury consisting of disjointed fingers of her right hand and injury to her wrist resulting in some permanent disability to her hand; that the injury occurred while she was engaged in picking up a large heavy pot of water. She was working as a waitress in the cafe owned and operated by her employer.

On April 20, 1955, respondent filed an additional or amended claim in which she stated that in addition to the injury sustained by her as stated in her original claim as a result of the same accident which occurred on October 20, 1954, she sustained an injury to her right hip, chest, back, left leg and knee and eight broken ribs resulting in some permanent disability to her person.

The trial commissioner at the close of the evidence found: that on October 20,

1954, claimant, while in the employ of respondent, sustained an accidental injury arising out of and in the course of her employment consisting of an injury to her right wrist; that on February 8, 1955, as a result of being under the influence of some type of injection given her by the treating doctor furnished claimant as part of her treatment for her right wrist, she fell down some cellar stairs and sustained an accidental personal injury to her rib cage, her right hip, back and left knee; that claimant was paid temporary total compensation in the sum of $384.64; that she was entitled in addition thereto to temporary total compensation in the sum of $63.36. The trial commissioner further found:

"That as a result of the accidental personal injury of October 20, 1954, claimant sustained 10% permanent partial disability to her right hand, for which she is entitled to 20 weeks compensation at $28.00 per week, or $560.00; that as a result of the accidental personal injury to her chest, back, and right hip on February 8, 1955, claimant sustained no permanent partial disability; that as a result of her accidental personal injury to her left leg on February 8, 1955, claimant sustained 30% permanent partial disability to said leg, for which she is entitled to 52.2 weeks compensation at $28.00 per week, or $1470.00, or a total permanent partial disability compensation payment of $2030.00 for both awards as hereinabove set out."

The trial commissioner upon such findings entered an order awarding respondent compensation accordingly which was sustained on appeal to the Commission en banc.

Petitioners bring the case here to review this award. They do not challenge the award insofar as it awards compensation to respondent for injury to her right hand. They however contend there is no competent evidence to sustain the finding of the Commission that respondent's fall down the stairway was the result of being under the influence of an injection administered by the doctor in treating her for injury to her wrist and that the award insofar as it awards her compensation for injuries received as the result of such fall should therefore be vacated.

Respondent after testifying as to the injury sustained to her right arm and resulting disability in substance further testified: Shortly after she sustained the injury to her right wrist she requested her employer to send her to a doctor. It did not then comply with the request for the reason as stated by Mr. Eaves, a member of the corporation, that they were short of help. She continued to work until November 12, 1954, when her wrist became worse and gave her considerable pain. She again requested her employer to send her to a doctor. She was then sent to a chiropractor for treatment who gave her several treatments. She was thereafter sent to another doctor who treated her. The treatments consisted mainly of injections in her arm. The injections were given to her over a period of time from January 24, 1955, to February 8, 1955. She further testified that after each injection she became sick and dizzy; that the day on which she took the last injection, which was February 8, 1955, she told the doctor that the injections made her sick and dizzy; the doctor told her that he would give her another injection and that it would be the last injection. She took the injection and again became dizzy and almost fainted. The doctor's nurse came to her assistance, lead her to a chair at an open window and placed her in the chair. She remained in the chair for a short period of time when her husband took her home. She was still feeling dizzy when she arrived at her home. Her husband placed her in bed and he remained with her for several hours when it became necessary for him to return to work. He then took her to the home of Mrs. Holloway, a neighbor and friend of the family and told her that his wife was sick and asked her to look after her and care for her until he returned. Mrs. Holloway placed her on a couch in her living room and told her she would be working

down in the cellar and to call her if needed. Respondent while lying on the couch became very sick and she arose and walked toward the stairway leading to the cellar in order to call Mrs. Holloway. As she approached the head of the stairs she suddenly blacked out and fell down the stairway causing the injuries mentioned in her amended claim.

There is some confusion in the evidence as to the exact date on which respondent fell down the stairway. Respondent in her testimony fixes the date as February 8, 1955. She, however, later qualified that statement by stating that the day on which she fell down the stairway was the day she took her last injection; that she didn't know whether that was on the 8th day of February, 1955, or some other day. The medical evidence shows that the day she received the last injection was March 25, 1955.

Respondent's husband testified that he went with his wife to the doctor's office on several occasions when she took the injections and that after each of such injections she became sick and dizzy.

The medical evidence consists of evidence of three doctors, Drs. G., F. and H. The doctor last named was appointed by the trial commissioner to examine respondent.

Dr. G, the doctor who administered the injections, testified that he first saw and treated respondent on November 26, 1954. He found that she was suffering from an injury to her right arm joint. The joint was sore, particularly over the navicular area. He gave her injections in her right arm to heal injury to tendons. He gave her seven or eight such injections. The last injection given her was on the 25th day of March, 1955. He gave her injections of medicine commonly used to relieve such injury. He further testified that the injections did not cause respondent to become sick and dizzy. Respondent never told him that she became sick after receiving such injections; she at no time became sick and dizzy while in his office

taking treatments. The doctor in answer to questions propounded by counsel further testified:

"Q. Did this medicine, when it is injected, make her dizzy? A. No.

"Q. Did you observe her after you gave these injections to her? A. Yes.

"Q. What was her reaction, Doctor? A. Her reaction was one of being fearful of all needles, rather than this specific medicine. That is rather a common thing, and she just didn't like to take hypos, and neither do I. But once the medicine was given and the needle was gone, why then she was all right, and nothing else happened. It was just a normal dislike for needles —for any needle—and that was the only reaction.

"Q. How long after this type of injection is given the patient should she be free from any ill effects from the injection, because of the use of the medicine? A. The medicine, itself, causes no untoward reaction. The only untoward reaction would be the dislike that people have of being given any injection by a hypo needle. In other words, once the needle is out the effect is gone as far as any untoward reaction is concerned."

Dr. F in his report filed with the Commission stated that he saw and examined respondent on April 7, 1955. He obtained a case history from respondent which is substantially as testified to by her and upon such history and his examination after stating in detail the nature of the injury sustained by respondent and resulting disability expressed the following opinion:

"Opinion and Discussion: This patient, in my opinion, has some residual permanent disability in the right wrist as a result of the injury which she sustained and it is my opinion that she has a 15% partial permanent disability of the right hand by reason of the injury which she sustained on 2-8-55, the patient has a considerable amount of residual permanent disability of the body as a whole and of

the left leg. The patient has residual disability in the thoracic cage, in 'the right hip and in the left knee. This accident resulted as the result of the patient being under the influence of some type of injection given to her by Dr. Gallagher as part of her treatment. It is my opinion that the patient has a 15% partial permanent disability of the body as a whole by reason of the injury to her chest and right hip and that she has a 20% partial permanent disability of the left leg by reason of the injury to the left knee as a result of the accident which she sustained on 2-8-55."

The doctor also testified orally. He testified that he did not know the type of injection given respondent by Dr. G and did not know of his own knowledge that the injection caused respondent to become sick and dizzy. He further testified that he based his conclusion in his written report upon the history of the case obtained from respondent and further testified:

"Q. And that is your opinion on this case, the disability in the amount that you have given here. A. Of course, it is qualified to the effect that if it can be established that it did, that the injections did make her dizzy, and that it did cause her to fall down the stairs, and not something else, I assume that it is directly attributable to the type of treatment that she got, if it cannot be established that it was something else."

Dr. H, the doctor appointed by the trial commissioner who examined respondent, in his report expressed no opinion as to the effect the injections administered had upon the respondent.

While there is some conflict in the evidence on the question as to whether respondent's sick and dizzy spells and the blackout occurring on the date she fell down the stairway was caused by the injections administered by Dr. G, we think the evidence of Dr. F when considered in connection with the evidence of the respondent is sufficient to sustain the finding of the Commission in this respect and sufficient to authorize an award for injuries received by her as the result of the fall.

In Skelton' Lead & Zinc Co. v. Bagby, 166 Okl. 214, 27 P.2d 168, we held:

"Where an injured employee submits to a surgical operation tendered to him by his employer for the purpose of perfecting a cure to restore his earning capacity, such employer is liable for compensation under said Workmen's Compensation Law [85 O.S.1951 § 1 et seq.] for the disability, if any, which may follow as result of said surgical operation regardless of any aggravation of any prior injury or the neglect or unskillfulness or error of judgment of the physician selected by the employer."

See, also, Kelley v. Roger Givens Wholesale Millwork, Okl., 281 P.2d 944.

Award sustained.

CORN, DAVISON, HALLEY, BLACKBIRD and CARLILE, JJ., concur.

WELCH and JACKSON, JJ., dissent.

JACKSON, Justice. (dissenting).

The majority opinion says " * * * we think the evidence of Dr. F when considered in connection with the evidence of the respondent is sufficient to sustain the finding of the Commission * * *".

The majority opinion overlooks the fact that Dr. F has not testified as a medical expert. He does not know what type of injection was administered, or how much, or that it had any effect at all. Any layman could, and would, without any knowledge of medicine reach the same conclusion that he reaches. The doctor's conclusions are not based upon his knowledge of medicine but upon pure logic.

From his oral testimony it is clear that Dr. F thinks he has correctly estimated the *amount* of her disability; that is, *if* it can be established that the injections did make her dizzy, and *if* it can be established that the injections did cause her to fall down

the stairs, and *if* it is not something else. The doctor recognizes the fact that his own testimony has not established any connection between the injection and her dizziness and fall.

The doctor finally concludes that it must have been the injection which caused her dizziness and fall, "if it cannot be established it was something else." No one can dispute that conclusion. All would agree that if nothing else caused her dizziness and fall, then it would have to be attributed to the injection.

The burden of proof was not upon petitioners to establish the cause of respondent's dizziness and fall. The burden was upon the respondent to establish a causal connection between the injection and the fall. This she has failed to do. Where there is no evidence to support the finding and decision of the Industrial Commission the award should be vacated. Magnolia Petroleum Co. v. McNeill, 163 Okl. 104, 21 P.2d 45.

I respectfully dissent.

I am authorized to state that Justice WELCH concurs in the views hereinabove expressed.