ULPIANO VÉLEZ, MANAGER, ETC., Petitioner, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, Respondent; MARÍA VILLAFAÑE ET AL., Interveners.

No. CI-64-2.     Decided November 25, 1964.

*Donald R. Dexter, Carmen Ana Archeval,* and *Aura Nélida Pérez* for petitioner. *Francisco Aponte for interveners.*

Division composed by Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

The Manager of the State Insurance Fund determined that Emilio Thompson Davis, interveners' predecessor, "did not suffer any labor accident . . . and that, in the unaccepted hypothesis of having suffered it, his death was the result of causes foreign and extraneous to the work he was performing . . .".

The Industrial Commission reversed the decision of the Manager. It determined that "the deceased laborer in this case was hospitalized by reason of an injury in his left

shoulder and if, because of his pain, he turned over abruptly in the stretcher, fell off and suffered injuries which led to his fatal doom, there probably exists a relation between the death and the injury suffered in his work."

We granted the Manager's petition for review.

The worker Emilio Thompson started to work at 7:00 a.m. Before starting to paint a tank of cane juice he had to move a five-gallon (5) paint can. The can weighed approximately 50 pounds. Five minutes after he had commenced to work he complained of a pain on his left shoulder. He could not continue working. The worker walked to the administrative office and from there to the guardhouse, where he took a car to the clinic.

He walked from the car to the building where the clinic was located. Upon arriving he informed the headnurse about the pain on his left arm. The headnurse took him to the emergency room and ordered a nurse to call Dr. Carrera, director of the Fajardo Clinic. The Doctor ordered a demerol injection, but he came to see the worker before he was given the injection.

The headnurse testified that when the patient arrived at the emergency room he was fatigued, sweating, and he looked physically run down, and that she lay him on a stretcher.

The commission summarizes the testimony of Dr. Carrera in the following terms:

"Dr. Carrera, in synthesis, testified that he is a surgeon and that he works in Fajardo Clinic; that on September 27, 1961 he was called at his home from Fajardo Clinic, informing him that there had arrived a serious case of a person who presented acute pain in the left arm; that he ordered the nurse who called him to give him an injection of demerol; that as he lives near the Clinic he arrived there in about five minutes and immediately went to the emergency room and found that person in a critical condition, that he was near death; that he was sweating, had acute dyspnea, was pulseless; that he asked the nurse whether she had taken his pressure and she informed that she

could not take it; that the person was dying; that he was going to use the stethoscope to auscultate him and ordered the nurse to bring an injection; that in this instant the man raised up abruptly and almost sat up, he turned himself over to the left and fell; that he tried to get hold of him, but it happened so fast that the man fell over the oxygen tank receiving a lacerated bruised wound on the left parietal region; that he did not reach the floor because the nurse and himself spared him the fall, but he hit against the tank; that they laid him down, and when the injection arrived it was too late. Dr. Carrera reported that when he entered the emergency room the worker was already dying; that from the history of the case, the fact of having arrived at the Clinic walking, that he walked from the entrance of the Clinic to the emergency room, he thought he had died of a cardiac condition; that as it was a sudden death he thought it was a heart attack and he stated so in his death report when he stated that he had died of coronary thrombosis. That he examined the man from head to foot and found no external injuries whatsoever neither in the skin nor in the face; that he only presented a wound in the head which was the one he suffered when the doctor was going to offer first aid and he hit against the tank of oxygen; that he could do nothing for him; that when he first saw him he was unable to speak . . .".

The doctor who made the autopsy certified that there was evidence of "cranial-encephalic, right pectoral, right clavicular and right hemothorax traumatisms" and that "as a result of said traumatisms the presence of petechial diffuse cerebral, right hemothorax hemorrhage, hematosis on the right pectoral and clavicular regions were determined. The microscopic examination determined the presence of multiple pulmonary embolus possibly of traumatic origin. He determined that "the death in the present case was the result, in my opinion, of the traumatisms suffered."

In order to determine whether the death which occurred in this manner is compensable it is proper to consider whether the worker suffered a labor accident prior to being confined in the clinic.

The Commission decided that the worker received an injury in his work. In fact, while the worker was working for his employer, after moving a paint can weighing about 50 pounds he felt acute pain in his left shoulder. It is reasonable to conclude that his having moved said can affected his left shoulder. Evidently, the three requisites to determine compensation concur herein: "the injury must (*a*) be the result of an act or function inherent in the employment; (*b*) have occurred in the course of the employment; . . . (*c*) be a consequence of the employment." *Cordero, Mgr.* v. *Industrial Commission*, 61 P.R.R. 349 (1943); Workmen's Accident Compensation Act, § 2, paragraph 1, 11 L.P.R.A. § 2 (1962 ed.). We must remember also what we said in *Feliciano* v. *Industrial Commission*, 84 P.R.R. 188, 206 (1961) to the effect that: "In this function of applying the Workmen's Compensation Act, we need not repeat nor support with authorities what constitutes the well-established rule that laws which are remedial in nature must be liberally construed in favor of those sought to be protected, or, as stated in *Spina* v. *Gahagan Construction Corp.*, 135 A.2d 760 (Pa. 1957), to accomplish their broad humanitarian purpose. Specifically, our Workmen's Accident Compensation Act, which is applicable to workmen who suffer injury, *are disabled*, or lose their lives by reason of accidents caused by any act or function inherent in their work, when such accidents occur in the course of said work, adopted by express legislative mandate the undisputed principle in the doctrine and provided that this Act shall be construed liberally, and that any reasonable doubt that may arise as to its application with regard to the existence of *causal relation* between the work or occupation of the workman or employee and the injury, disability or death, or the occupational character of a disease, *shall be decided in favor* of the workman or employee or his beneficiaries. Section 2 of Act No. 45 of 1935 (Sess. Laws, p. 250), as amended by Act No. 94 of

June 22, 1957 (Sess. Laws, p. 439). This provision involves the recognition by the lawmaker, for the guidance of the administrative agencies concerned, that it is not always feasible, particularly if there are different medical criteria, to establish with certainty and without room for doubt the legal right to compensation, and that there are areas of reasonable doubt which should not defeat the remedial purposes of the law nor the right to compensation."

Having decided that the worker had suffered a compensable injury prior to being confined in the clinic, it is proper to consider the second question, compensation for the death.

According to the certificate of the doctor who performed the autopsy, the worker died as a consequence of the traumatisms suffered. He suffered one of them in the skull when he hit his head against the oxygen tank. It was a severe contusion which affected his brain and produced hemorrhage. Dr. Rolenson was of the opinion that "it must be accepted that said condition was one of the causes of the death and the most probable one."

It is generally accepted that the causal connection which must exist between the accident and the employment in order that it be compensable is not interrupted if as a result of said accident or injury the worker requires first aid, hospitalization and treatment and when it is being provided he suffers another injury or the previous condition becomes more serious causing disability or death. *Hornetz* v. *Philadelphia & Reading Coal & Iron Co.*, 120 Atl. 662 (1923) illustrates the rule stated. A worker broke his finger and had to be operated on. To perform the operation they administered anesthetic, which caused a dilation of his heart which in turn caused his death. In deciding the case the court stated the following:

"The violence [on the finger] caused the injury, the injury caused the operation, the operation caused the anaesthetization, the anaesthetization caused dilatation of the heart, and dilata-

tion of the heart caused death. Hence there was a causal connection between the [original] violence and [the subsequent] death."

See, also: *Balancio* v. *United States*, 267 F.2d 135 (2d Cir. 1959); *Sarber* v. *Aetna Life Ins. Co.*, 23 F.2d 434 (9th Cir. 1928); *Bettasso* v. *Snow-Hill Coal Corporation*, 189 N.E.2d 833 (Ind. 1963); *Flanagan* v. *Charles E. Green & Son*, 5 A.2d 742 (N.J. 1939); *Abney and Eaves, Inc.* v. *Redeker*, 303 P.2d 417 (Okla. 1956); *McAvoy* v. *Roberts & Mander Stove Co.*, 98 A.2d 231 (Penn. 1953); 1 Larson, Workmen's Compensation Law, §§ 13.00, 13.21 (1964 ed.).

Under similar circumstances we sustained the compensation for the subsequent injury. In *Cordero, Mgr.* v. *Industrial Commission*, 62 P.R.R. 409 (1943) a worker suffered an accident while on her way to the dispensary of the State Insurance Fund to receive treatment in connection with an accident previously suffered in the course of employment. We decided that the second accident was compensable.

Thus the determination of the Industrial Commission holding that the death was compensable was correct.

The insurer objects to the determination of dependency made by the Industrial Commission. The compensation is claimed by a woman who was living maritally with the worker on the date of his death, and her three sons by another man. The Fund maintains that it was not established that the worker lived maritally with the claimant during the last three years as required by law. As to the three children it alleges that, in fact, they were not the worker's dependents.

■ The evidence having been examined there is sufficient basis to support the decision of the Commission to the effect that "María Villafañe Rodríguez lived honestly in concubinage as man and wife with Emilio Thompson Davis for over three and a half years and that her minor children José Manuel, Tomás, and Carmen María Díaz, as well as

Federica Davis, mother of the deceased, proved their economic dependency with respect to him."

■ The allegation of the Fund in the sense that it did not have the opportunity to introduce evidence on the aspect of dependency is completely frivolous. María Villafañe was submitted to intense cross-examination by the attorneys of the Fund as to the time she lived maritally with the worker. Apparently there arose certain doubt in the mind of the witness due to the manner in which the cross-examination was conducted. It was so overwhelming that the Commissioner who presided the hearing, addressing the representatives of the Fund, stated: "We must hurry. We are taking too much time for this." The statement of the Commissioner does not have the significance attached to it by the representative of the Fund. The record shows that the Commissioner granted the necessary opportunity to cross-examine the witness. The Commission conducted the hearing impartially and fairly for both parties.

■ The question raised by the Fund to the effect that it had not been proved that the worker's dependents had given their representation to the attorney who appeared in the appeal at the time it was filed before the Industrial Commission and that, consequently, the appeal filed before said agency had prescribed, is absolutely frivolous.

The order appealed from will be affirmed.