ULPIANO VÉLEZ, ETC., recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, demandada; MARÍA VILLAFAÑE ET AL., interventores.

*Número:* CI-64-2      *Resuelto:* 25 de noviembre de 1964

---

*Donald R. Dexter, Carmen Ana Archeval* y *Aura Nélida Pérez,* abogados del recurrente; *Francisco Aponte,* abogado de los interventores.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El Administrador del Fondo del Seguro del Estado determinó que Emilio Thompson Davis, causante de los interventores, "no sufrió accidente del trabajo alguno . . . y que en la hipótesis no aceptada de haberlo sufrido su muerte se debió a causas ajenas y extrañas al trabajo que el mismo realizaba . . .".

La Comisión Industrial revocó la decisión del Administrador. Determinó que "el obrero occiso en este caso, fue hospitalizado por motivos de su lesión en el hombro izquierdo y si por su dolor al voltearse bruscamente en la camilla se cayó y sufrió lesiones que le llevaron al fatal desenlace lo probable es que exista relación entre su muerte y la lesión recibida en su trabajo".

Accedimos al pedido de revisión del Administrador.

El obrero Emilio Thompson comenzó a trabajar a las siete de la mañana. Antes de comenzar a pintar un tanque de guarapo tuvo que mover una lata de pintura de cinco galones. La lata tenía un peso aproximado de 50 libras. A los cinco minutos de haber comenzado su trabajo se quejó de dolor en el hombro izquierdo. No pudo seguir trabajando. El obrero

caminó hasta la oficina de la administración y de allí a la caseta de un guardia donde tomó un automóvil que le llevó hasta la clínica. Caminó del automóvil al edificio donde está localizada la clínica. Al llegar informó a la Directora de Enfermeras del dolor que tenía en el brazo izquierdo. La Directora lo llevó a la sala de emergencia y ordenó a una enfermera que llamara al Doctor Carrera, Director de la Clínica Fajardo. El doctor ordenó se le pusiera una inyección de demerol, pero éste llegó al sitio donde estaba el obrero antes de que le hubieran puesto la inyección.

La Directora de Enfermeras declaró que cuando llegó el paciente a la sala de emergencia estaba fatigoso, sudando y no se veía en buenas condiciones físicas y que lo acostó en una camilla.

La Comisión resumió el testimonio del doctor Carrera en los siguientes términos:

"El Dr. Carrera en síntesis declaró que es médico cirujano y trabaja en la Clínica Fajardo; que para el 27 de septiembre de 1961 fue llamado a su casa por teléfono de la Clínica Fajardo, informándosele que había llegado un caso grave de un individuo que presentaba un dolor intenso en el brazo izquierdo; que le pidió a la enfermera que lo llamó que le pusiera una inyección de Demerol; que como vive cerca de la Clínica llegó allí como a los cinco minutos e inmediatamente se fue a la sala de emergencia y encontró que el individuo estaba en una situación crítica, que estaba al borde de la muerte; que estaba sudoroso, tenía disnea intensa, no tenía pulso; que le preguntó a la enfermera si le había tomado la presión y ésta le informó que no se le había podido tomar; que el individuo estaba agonizando; que se fue a poner los aparatos para auscultarlo y le pidió a la enfermera que trajera una inyección; que en ese momento el hombre se incorporó violentamente y casi se sentó, se viró a la izquierda y cayó; que él trató de cogerlo, pero fue tan rápido que el hombre cayó sobre el tanque de oxígeno recibiendo una herida lacerada contusa en la región parietal izquierda; que no cayó al suelo ya que con su ayuda y la de la enfermera evitaron que se cayera, pero se tiró contra el tanque; que lo acostaron, y cuando vino la inyección ya era tarde. Informó el Dr. Carrera

que cuando él entró a la sala de emergencia ya el obrero estaba agonizando, ya estaba en los últimos momentos de su vida; que por el historial del caso, el hecho de haber llegado a la clínica caminando, que caminó desde la entrada de la clínica hasta la sala de emergencia, estimó que había muerto de una condición cardíaca; que como fue una muerte súbita, una muerte rápida, estimó que había sido causa cardíaca y así lo hizo constar en el informe de defunción cuando puso que había muerto de trombosis coronaria. Que examinó al individuo de arriba abajo y no tenía lesiones externas de ninguna clase ni en la piel ni en la cara; que solamente presentaba herida en la cabeza que fue la que recibió cuando él le iba a llevar los primeros auxilios y se dio con el tanque de oxígeno; que no pudo hacer nada por este individuo; que cuando lo vio no hablaba. . .".

El médico que practicó la autopsia certificó que había evidencia de "traumatismos cráneo-encefálico, pectoral derecho, clavicular derecho y en el hemotórax derecho" y que "como resultado de dichos traumatismos, se determinó la presencia de hemorragia petiquial difusa cerebral, hemotórax derecho, hematomas de la región pectoral y clavicular derechas." El estudio microscópico determinó la presencia de embolias pulmonares múltiples de posible origen traumático. Concluyó que "la muerte en el presente caso se debió, a mi entender, a los traumatismos recibidos".

Para poder determinar si esa muerte así ocurrida es compensable procede considerar si el obrero sufrió un accidente del trabajo antes de ser ingresado a la clínica.

■ La Comisión concluyó que el obrero recibió una lesión en su trabajo. En efecto, mientras el obrero trabajaba para su patrono luego de manipular una lata de pintura con un peso de cerca de medio quintal sintió un fuerte dolor en el hombro izquierdo. Es razonable concluir que el haber manipulado la referida lata le afectó el hombro izquierdo. Evidentemente concurren los tres requisitos exigidos para determinar compensabilidad: "la lesión debe (a) ser el resultado de un acto o función inherente al empleo; (b) haber ocurrido en el curso del empleo; (c) ser consecuencia del empleo". *Cordero,*

*Admor.* v. *Comisión Industrial*, 61 D.P.R. 361 (1943) ; Ley de Compensaciones por Accidentes del Trabajo, Art. 2, párrafo 1ro., 11 L.P.R.A. sec. 2 (ed. 1962). Debemos además recordar lo que expresamos en *Feliciano Figueroa* v. *Comisión Industrial*, 84 D.P.R. 196, 215 (1961) al efecto de que: "En esta función de aplicar la Ley de Compensaciones a Obreros no hay que repetir ni sostener con autoridades lo que constituye el arraigado principio de que leyes de esta naturaleza, por ser remediadoras, han de interpretarse liberalmente en favor de aquellos a quienes intentan proteger, o como se dijo en *Spina* v. *Gahagan Construction Corp.* (Pa. 1957) 135 A.2d 760, para que se cumplan sus amplios propósitos humanitarios. En particular, nuestra propia Ley de Compensaciones por Accidentes del Trabajo aplicable a los obreros que sufren lesiones *o se inutilizan* o pierden la vida por accidentes que provengan de cualquier acto o función inherente al trabajo ocurrido en el curso de éste, adoptó por mandato legislativo expreso el principio no discutible en la doctrina, y dispuso que la ley se interpretaría liberalmente, y que cualquier duda razonable que en su aplicación surgiere en cuanto a la existencia de *relación causal* entre el trabajo u ocupación del obrero o empleado y la lesión, incapacidad o muerte, o el carácter ocupacional de una enfermedad, *deberá resolverse a favor* del obrero o empleado, o sus beneficiarios. Art. 2 de la Ley 45 de 1935, según fue enmendado por la Ley 94 de 22 de junio de 1957. Esta disposición envuelve un reconocimiento del Legislador para guía de los organismos administrativos que intervienen, de que no siempre puede ser factible, sobre todo si hay criterios médicos no coincidentes, el probar bajo la Ley un derecho a compensación de manera absoluta o sin lugar a duda alguna, y que existen áreas de dudas razonables que no deben derrotar los propósitos remediadores de la ley ni el derecho a compensación."

Habiendo concluido que el obrero sufrió una lesión compensable antes de ingresar a la clínica, procede pasar a considerar la segunda cuestión, la compensabilidad de la muerte.

De acuerdo con lo certificado por el médico que practicó la autopsia el obrero murió a consecuencias de traumatismos recibidos. Uno de éstos fue recibido en el cráneo al darse con el tanque de oxígeno. Fue una contusión fuerte que le afectó el cerebro y le produjo una hemorragia. El doctor Rolenson opinó que "hay que aceptar que esa condición fue una de las causas de la muerte y la más probable".

■ Es generalmente aceptado que el nexo causal que deberá existir entre el accidente y el empleo para que éste sea compensable no queda interrumpido si con motivo de dicho accidente o lesión el obrero requiere primeros auxilios, hospitalización o tratamiento y al serle éste suministrado sufre otra lesión o se le agrava la condición anterior causándole incapacidad o muerte. *Hornetz* v. *Philadelphia & Reading Coal & Iron Co.*, 120 Atl. 662 (1923) es un caso ilustrativo de la regla expuesta. Un obrero sufrió una fractura en un dedo y tuvo que ser operado. Para operarlo lo anestesiaron y la anestesia le ocasionó una lesión cardíaca que le causó la muerte. Al resolver la cuestión la corte se expresó así:

"La violencia (al dedo) causó la lesión, la lesión causó la operación, la operación hizo necesario el anestésico, el anestésico causó una dilatación del corazón y la dilatación del corazón ocasionó la muerte. Ciertamente hubo nexo causal entre la lesión original y la muerte ocurrida posteriormente."

Véanse además: *Balancio* v. *United States*, 267 F.2d 135 (2d Cir. 1959); *Sarber* v. *Aetna Life Ins. Co.*, 23 F.2d 434 (9th Cir. 1928); *Bettasso* v. *Snow-Hill Coal Corporation*, 189 N.E.2d 833 (Ind. 1963); *Flanagan* v. *Charles E. Green & Son*, 5 A.2d 742 (N.J. 1939); *Abney and Eaves, Inc.* v. *Redeker*, 303 P.2d 417 (Okl. 1956); *McAvoy* v. *Roberts & Mander Stove Co.*, 98 A.2d 231 (Penn. 1953); 1 Larson,

*Workmen's Compensation Law*, secs. 13.00, 13.21 (ed. 1964).

En parecidas circunstancias hemos sostenido la compensabilidad de la lesión posterior. En *Cordero, Admor.* v. *Comisión Industrial*, 62 D.P.R. 429 (1943) una obrera sufre un accidente cuando se dirigía al dispensario del Fondo del Seguro del Estado a recibir asistencia médica en relación con un accidente anterior sufrido en el curso del empleo. Resolvimos que era compensable el segundo accidente.

Así, fue correcta la resolución de la Comisión Industrial al sostener la compensabilidad de la muerte.

El asegurador ataca la determinación de dependencia hecha por la Comisión Industrial. Reclaman los beneficios de la ley una mujer que vivía con el obrero a la fecha de su muerte y tres hijos de ésta con otro hombre. El Fondo sostiene que no se estableció que el obrero viviera con la reclamante durante los últimos tres años como lo requiere la ley. En cuanto a los tres hijos alega que éstos de hecho no dependían del obrero.

■ Examinada la prueba hay base suficiente para sostener la conclusión de la Comisión al efecto de que "María Villafañe Rodríguez vivió en honesto concubinato como marido y mujer con Emilio Thompson Davis por más de tres años y medio y que sus hijos menores José Manuel, Tomás y Carmen María Díaz así como la Sra. Federica Davis, madre del occiso probaron su dependencia económica en relación con éste".

■ La alegación del Fondo de que no tuvo oportunidad de presentar prueba sobre el aspecto de dependencia es enteramente frívola. María Villafañe fue sometida a un intenso contrainterrogatorio por parte de los abogados del Fondo en cuanto al tiempo que estuvo viviendo con el obrero. Aparentemente surgió cierta duda en la mente de la testigo por la forma en que era conducido el contrainterrogatorio. Era tan agobiante que el Comisionado que presidía la vista dirigién-

dose a la representación del Fondo manifestó "Tenemos que avanzar. Estamos tomando demasiado tiempo en esto". La expresión del Comisionado no tiene la importancia que le da la representación del Fondo. El récord demuestra que la Comisión le dio toda la oportunidad necesaria para contrainterrogar a la testigo. La Comisión condujo la vista imparcialmente con justicia para todas las partes.

■ La cuestión levantada por el Fondo al efecto de que no se demostró que los dependientes del obrero habían concedido su representación al abogado que compareció en el recurso en la fecha en que el mismo fue radicado ante la Comisión Industrial y que en su consecuencia estaba prescrito el recurso interpuesto para ante dicho organismo, es absolutamente frívola.

*Se confirmará la resolución recurrida.*